In re Wayne Roger GUMIENY, Debtor.

AMERICAN FAMILY INSURANCE GROUP, a domestic insurance corporation, Plaintiff,

v.

Wayne Roger GUMIENY, Defendant.

Bankruptcy No. 79–02410.
Adv. No. 80–0200.

United States Bankruptcy Court, E. D. Wisconsin.

Jan. 30, 1981.

James W. Hill, Racine, Wis., for plaintiff.

Harrison W. Nichols, Union Grove, Wis., for defendant/debtor.

## DECISION

D. E. IHLENFELDT, Bankruptcy Judge.

American Family Insurance Group (American), a creditor, has filed what is in effect a motion to extend time for filing a complaint seeking to except its claim from discharge under § 523(a)(4).[1]

The debtor filed this Chapter 7 case on December 19, 1979. On December 28, 1979, an order was entered scheduling the § 341(a) hearing for January 10, 1980, and in accordance with Bankruptcy Rule 409(a)(2), March 10, 1980 was fixed as the last day for filing a complaint to determine the dischargeability of a debt under § 523(a)(2), (4), or (6), pursuant to 11 U.S.C. § 523(c). Copies of the order were mailed to all creditors the same day. On April 4, 1980, pursuant to § 524(d), an order was entered fixing April 24, 1980 as the date for hearing and approving reaffirmation agreements—the so-called "discharge hearing." Copies of this notice and order were mailed to all creditors that same day, April 4, 1980.

On June 12, 1980, American filed its motion with a supporting affidavit. The affiant, an attorney, stated that it was American's policy to refer to him all pleadings and correspondence pertaining to bankruptcy proceedings; that he did not receive the December 28, 1979 notice and had been unable to locate it in American's files; that the first notice he had received was the April 4, 1980 notice of the discharge hearing; and that had he received the initial notice, he would have filed a timely nondischargeability complaint on behalf of American. Also accompanying American's motion was its proposed nondischargeability complaint.

Bankruptcy Rule 906(b)(2), which was adopted from Rule 6(b) of the Federal Rules of Civil Procedure, is applicable to American's motion to extend time, and it provides that the court may, after the expiration of the period specified and for cause shown, extend the time and permit the subsequent doing of an act required to be done pursuant to a notice given in accordance with the rules or by a court order where the failure to act within the time fixed was "the result of excusable neglect."

When mailing notices to creditors in this district, the clerk's office uses a matrix or master list supplied by the debtor's attorney from which the addresses are photocopied onto gummed labels, which in turn are affixed to the face of the mailing envelopes.

1. § 523. Exceptions to discharge.

  (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

  (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

The master list in this case contains American's correct mailing address, and a certificate of mailing is signed by a deputy clerk reciting that the initial December 28, 1979 notice was mailed to all creditors. The court's files often contain letters returned by the post office as undeliverable, but no such letter addressed to American was returned.

Anything is possible, of course, and it cannot be stated with certainty exactly what happened in this case, i.e., whether the deputy clerk failed to get the letter into the mailbox, whether it was lost or misdirected by the postal service, or whether it was lost or misdirected by American upon receipt. American's affidavit fairly states that a diligent search has been made of American's records, but the notice could not be found. In the absence of some sort of log for incoming mail, it does not seem that American could say more.

Assuming that American received the initial bankruptcy notice in the mail, and absent any allegation of fraud on the part of the debtor, or an "act of God" event interfering, it is unlikely that any court would condone the long filing delay in this case on the ground of excusable neglect. *In re Manning* (D.Conn., 1978), 4 BCD 304; *In re Lee* (E.D., Va., 1978) 4 BCD 585; *In re Wooding* (D.Kans., 1974) 1 BCD 451. The issue in this case is therefore not so much that of excusable neglect, but rather a factual issue regarding delivery of the initial notice.[2]

Interestingly, this case presents almost a mirror image of the situation in *In re Nimz Transportation, Inc.* (7th Cir., 1974) 505 F.2d 177. In the *Nimz* case, evidence was presented that proofs of claim had been mailed to the clerk of the district court, but the clerk's file did not contain the proofs of claim. In the absence of evidence that the claims were not received, or of the procedures used by the clerk in processing claims received through the mail, the court held that the "presumption of receipt" must prevail. The court said:

"It is also well recognized, however, that a timely and accurate mailing raises a rebuttable presumption that the mailed material was received, and thereby filed. *Hagner v. U. S.*, 285 U.S. 427, 430 [52 S.Ct. 417, 418, 76 L.Ed. 861] (1932); *Haag v. Commissioner*, 59 F.2d 516, 517 (7th Cir. 1932).

"Although the record supports the finding of a timely and accurate mailing, we cannot conclude that the presumption of receipt which correspondingly arises has been rebutted."

The court went on to say the circumstances that the clerk's files did not contain the proof of claims was by itself insufficient to rebut the presumption of receipt.

In the case at bar, the record shows that the first notice was mailed to American at its correct address, and that the letter was not returned to the court by the post office. In the absence of any evidence to the contrary, it must be presumed that American received the notice. The court will add further its belief that the circumstances in this case tend to support that conclusion—that the most likely happenstance is that the notice was received by American and then mislaid or misdirected in the internal procedures of the company. American's resultant delay in filing has not been shown to be due to excusable neglect, and its application to extend time must be denied.

While the foregoing is dispositive of this action, a few additional comments are offered regarding American's proposed complaint. It recites that the debtor had acted as American's agent, and as such had received certain insurance premiums which constituted trust funds in his hands by reason of Section 3c of a written agreement which debtor had entered into with American. The complaint recites further that debtor had failed to pay trust funds to American in the sum of $4285 and had converted them to his own use. Section 3c of the agreement states:

---

2. In view of the court's decision with respect to the earlier notice, no finding is made regarding the issue of excusable neglect which might arise by reason of American's two month delay following the April 4, 1980 notice, which was admittedly received.

3. The agent agrees:

    c.  to deliver policies and to collect premiums and other moneys due the company in accordance with company rules and while in possession of any such money to hold it in trust as the absolute property of the company.

Affidavits filed by the parties indicate that when initially employed, the debtor received a monthly draw of $700 and commissions. He maintained a personal checking account at one bank and a business account at another. Insurance premiums collected were always deposited in the business account, but since commissions earned on the premiums collected were insufficient to balance the draws, the balance in the account dropped below what was owing to American, and from time to time checks which the debtor sent in payment to American were returned for insufficient funds. On many occasions over the years, the debtor owed American in excess of $5000. American of course was aware of all this, if for no other reason because of the "NSF" checks.

American offers two alternative theories of liability: (1) Debtor acted in a fiduciary capacity as to premiums collected by reason of the agency agreement, and (2) debtor's use of the premiums constituted a conversion or embezzlement by one acting as trustee or bailee.

■ The requirement that the debtor be acting in a fiduciary capacity has consistently been limited to technical or express trusts, and not to trusts that may be imposed by the very act of wrongdoing out of which the contested debt arose, and there is no reason to believe that § 523(a)(4) of the new Bankruptcy Code will be construed otherwise. 3 Collier on Bankruptcy p. 523–99 (15th ed.). In response to the court's inquiry whether the debtor's alleged fiduciary status derived from any state statute, plaintiff's counsel cited Wis.Stats. s. 943.-20(1)(b), the general criminal statute covering misappropriation and theft. Although

that section makes reference to theft by a trustee or bailee, commonly referred to as embezzlement, there is no specific mention of insurance agents. Apparently, like Michigan [3] and unlike Kansas, Missouri and others,[4] Wisconsin has no statute giving insurance agents the status of fiduciaries within the meaning of the Bankruptcy Code. Whether or not the debtor has the status of a fiduciary is most important, since "defalcation" by a fiduciary will create a nondischargeable debt, and while it may require "some portion of misconduct", defalcation is broader than embezzlement and probably broader than misappropriation. 3 Collier on Bankruptcy p. 523–96 (15th ed.).

Apart from the issue of debtor's fiduciary capacity within the meaning and intent of § 523(a)(4), American also charges the debtor with conversion or embezzlement. In the court's view, either of these terms more closely fits the circumstances of this case. They present factual issues, however, which could not be resolved on the record as it presently stands.

■ Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud. *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1877). "While acting in a fiduciary capacity" does not qualify the word "embezzlement" in § 523(a)(4). 3 Collier on Bankruptcy 523–106 (15th ed.).

■ The term "willful and malicious conversion of the property of another" was contained in clause 2 of section 17(a) of the former Bankruptcy Act. A debt arising from unlawful conversion of the property of another is not specified as nondischargeable in § 523(a) of the Code, because the words "willful and malicious injury" contained in § 523(a)(6) cover a "willful and malicious conversion." 3 Collier on Bank-

**3.** *In re Titus* (E.D.Mich.1976) 2 BCD 554.

**4.** *In re Apsey* (Kans.1975) 1 BCD 822.

*In re Klein* (W.D.Mo.1977) 3 BCD 638.
*In re Herring* (N.D.Ga.1978) 4 BCD 104.

ruptcy p. 523–114 (15th ed.). Under the new Code, the "reckless disregard" standard of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) has been expressly overruled, and a debt is now nondischargeable on the grounds of conversion only if the creditor shows that the property was maliciously and willfully converted with an intent to harm the creditor. H.R. Rep.No.95–595, 95th Cong., 1st Sess. 363 (1977); S.Rep.No.95–989, 95th Cong., 2nd Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *In re Hawkins* (W.D.Ky.1980) 6 BCD 1054.

From the foregoing, it can be seen that a creditor seeking a nondischargeability finding must prove intentional fraud in the case of embezzlement or conversion, whereas defalcation by a fiduciary requires something less than that. Furthermore, knowledgeable acquiescence by the creditor leading a debtor to believe his course of conduct is proper, as well as general principles of laches and waiver, may defeat these types of actions and cause the debt to be discharged. *In re McGinnis* (10th Cir. 1978) 4 BCD 1278; *In re Dyke* (S.D.Ohio, 1975) 1 BCD 1633.

In the case before the court, the debtor's agency account delinquency with American extended back several years prior to bankruptcy. Copies of American letters on file contain complaints as to the debtor's delinquency and the receipt of "NSF" checks, a discussion of possible methods of payment to reduce the balance, criticism of his agency management and production record, acknowledgment of his health problems (he had a heart attack), and threats to terminate as well as the ultimate termination of his agency agreement. Although the written agreement speaks of holding the premiums in trust, the letters contain no specific complaints or instructions regarding the manner in which the bank account was kept, that is, premiums being deposited and monthly draws taken, with a resultant shortage in the business bank account.

The foregoing discussion should not be taken as an indication as to the merits of American's case. Its charges of conversion

and embezzlement raise issues of fact concerning which the present record is insufficient to warrant any conclusions.