In the Matter of Francis J. DONNY, Debtor.

Herman F. DANEKAS, Plaintiff,

v.

Francis J. DONNY, Defendant.

Bankruptcy No. M M 7–80–0 1701. Adv. No. 81–0009.

United States Bankruptcy Court, W. D. Wisconsin.

April 8, 1982.

Denis P. Bartell, Ross & Stevens, S. C., Madison, Wis., for defendant.

John L. Olson, Schlueter, Ecklund, Olson & Barrett, Rockford, Ill., for plaintiff.

## OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

On November 7, 1980, debtor-defendant, Francis J. Donny filed a voluntary petition in bankruptcy under chapter 7. Listed in his schedule of unsecured debts, was the sum of $7,600 owed to Herman F. Danekas. On January 13, 1981, Danekas filed a complaint to object to the discharge of this sum, based on 11 U.S.C. § 523(a)(4) and (6). In 1977 Donny and Danekas entered into an oral agreement under which Donny was to manage Danekas' farms and cattle, including buying, caring for, and selling the animals. The agreement continued in 1978 and 1979. Donny received $1,500 a month for his services in managing the farms and cattle in 1979. Donny was also responsible for managing the rental buildings on Danekas' farms. He was to collect the rent, pay the utilities and remit the balance to Danekas.

Donny managed both a farm held in a family trust and some dairy cattle, which he personally owned, during part of this period. He sold the last of his own herd in early 1980. Due to his family problems and unspecified business reversals, Donny was in poor emotional health and in very bad financial condition in late 1979 and until his petition in chapter 7 was filed on November 7, 1980.

During 1979 and 1980, Donny made numerous sales of cattle, including sales to Thomas Phillips, Robert Clayton and someone identified only as the "young farmer." Between May, 1979, and September, 1980, Donny made five sales of Danekas' cattle to Phillips, who appeared to be a young, bright, and aggressive dairy farmer. Each of the sales was made at a price substantially below the then general market price for average condition cattle, and Phillips testified that in each case, he considered the cattle to be worth significantly more than what he paid for them. This testimony was not contradicted. In all but the first and largest sale, Phillips made the checks to the order of Donny. In one instance, Donny accepted a post-dated check from Phillips. Donny deposited the checks, payable to him, which totalled $2,400 in his own bank account. None of the funds thus deposited was ever forwarded or transferred to Danekas. Donny testified that he used this money in the normal course of the business he conducted on behalf of Danekas, but produced no evidence or records which supported this assertion.

Danekas testified that he first learned about the last four sales to Phillips when he was contacted by U.S.D.A. investigators. He testified that he had previously requested Donny to have all checks for cattle sales made directly to him and had believed that Donny had done so.

Donny also made several sales of cattle to Robert Clayton, a cattle broker. Donny testified that some of the sales were of his own cattle and some were of Danekas' cattle. Because Donny kept no formal records, the characteristics of the sales must be reconstructed from checks and deposit slips. The first two sales occurred on or about December 12 and 13, 1979. These sales totalled $4,900 and were deposited in the Donny "Hay Account." On April 4, 1980, the third deposit for the sale of cattle was

made.[1] This sale was for $3,450 and was also deposited in the "Hay Account." Two further deposits were made in the "Hay Account" in May for $2,500 and $2,000.

Donny testified that each of the sales represented by these deposit slips was of his own cattle. Donny stated that he knew this because he made a notation on his deposit slip if the cattle sold belonged to Danekas. Clayton claimed no knowledge of the ownership of the cattle in question.

With respect to the December, 1979, deposits, it is plausible that the cattle sold belonged to Donny. Donny testified that he was still in the cattle business at the time of these sales. However, the last three deposits were made in April and May of 1980 two to three months after Donny ceased cattle farming. It is extremely unlikely these deposits represent cattle sold in January when Donny still owned cattle. Clayton testified that it was his practice to pay for cattle no more than ten days after their receipt. Further, it is improbable that anyone in as dire financial straits as Donny claims to have been would have waited two to three months to receive payments. This analysis supports the conclusion that the last three sales totalling $7,950 were of Danekas' cattle.

In 1980, Donny sold some of Danekas' cattle to a person identified only as the "young farmer." The cattle were sold at a price of $6,200. The farmer held the cattle for thirty days without paying. Donny then had Clayton repossess the cattle. Clayton sold them for $5,000 in February of 1980 and sent the check to Donny. Donny later wrote Danekas a check for $5,000 which was returned for insufficient funds. Donny testified that the bank had debited his account in February and this was the cause of the check being returned. Donny made the check good by paying Danekas $5,000 in August, 1980, from other funds.

Donny, as mentioned earlier, also managed the rental property on the Danekas farm. Donny would deposit rent checks in his own account, and it appears that Dane-

kas consented to this practice. Once a year, they would have a reconciliation, at which time Donny would pay to Danekas any rent in excess of expenses. The last reconciliation occurred on February 15, 1980. After February of 1980, Donny collected $1,030 in rent on two houses. None of this rent was forwarded to Danekas. The rent from the other house was paid directly to Danekas at his request. After July of 1980, Donny directed all tenants to pay Danekas directly.

Donny produced power and light bills which he testified related exclusively to the rental property. These bills totalled $1,699.50 and were for the period beginning February, 1980. Donny testified that he paid these bills with no reimbursement from plaintiff. According to his testimony, he paid out $669.50 more in expenses on the rental property than he took in as rent. However, this testimony is at variance with Donny's bankruptcy petition. On his schedules, he listed a debt to Danekas for $1,400 for rent. At trial, he testified that he was under intense pressure at the time of the filing, and that he erred in listing the $1,400 figure which represented the total amount of rent he believed he had collected without deduction for the bills which he had paid.

11 U.S.C. § 523(a)(4) excepts from discharge debts for fraud or defalcation while acting in a fiduciary capacity.

> The qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose. There is no reason to believe that Section 523(a)(4) will be construed otherwise. Thus, unless there be some additional fact, Section 523(a)(4), insofar as it relates to a debtor acting in a fiduciary capacity, does not apply to frauds of agents, bailees, brokers, factors, partners, and other persons similarly situated. 3

---

1. On January 21, 1980, Donny deposited a $600 check in his account. It appeared to be undis-

puted that this check was for the sale of Donny's hay, not cattle.

Collier on Bankruptcy ¶ 523.14 (15th ed. 1981). (Footnotes omitted.)

■ Assuming, as we must, that the relationship of Danekas and Donny is that of principal and agent, Donny was not acting in a fiduciary capacity when he sold cattle for Danekas. In 1844 the Supreme Court narrowly defined the concept of fiduciary in bankruptcy cases, and courts have strictly adhered to this narrow definition in subsequent cases. In *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), the Court considered whether a factor who retained the money of his principal was a fiduciary within the Act of 1841. The Court said:

> If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all of the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in first section of the act. . . . The act speaks of technical trusts, and not those which the law implies from the contract. 43 U.S. (2 How.) at 207.

The Supreme Court spoke again on the question in *Noble v. Hammond*, 129 U.S. 65, 69, 9 S.Ct. 235, 237, 32 L.Ed. 621 (1888) saying: "[T]his court held . . . that the phrase 'in any other fiduciary capacity,' referred not to those trusts which the law implies from the contract, and which form an element in every agency, and in nearly all the commercial transactions in the country, but to technical trusts. . . ."

In *In re Gumieny*, 8 B.R. 602, 3 C.B.C.2d 834, Bankr.L.Rep. (CCH) ¶ 67,916 (Bkrtcy. 1981), a case from the Eastern District of Wisconsin, the debtor was an insurance agent who signed an agreement to collect premiums and hold them in trust for the insurance company. In considering whether the debtor acted in a fiduciary capacity as to premiums collected, the court restated the established definition first formulated by the Supreme Court in *Chapman v. Forsyth, infra*.

> The requirement that the debtor be acting in a fiduciary capacity has consistently been limited to technical or express trusts, and not to trusts that may be imposed by the very act of wrongdoing out of which the contested debt arose, and there is no reason to believe that § 523(a)(4) of the new Bankruptcy Code will be construed otherwise. 8 B.R. at 605, 3 C.B.C.2d at 837. (Citations omitted.)

See also the analysis contained in *In re Dawson*, 16 B.R. 343, Bankr.L.Rep. (CCH) ¶ 68,573 (Bkrtcy.N.D.Ill.1982). There is no basis on which the present case should be distinguished from this clear and controlling precedent. Danekas' claim under 11 U.S.C. § 523(a)(4) is without legal merit.

The remaining issue is whether the acts of Donny constituted a "willful and malicious injury" to Danekas or his property as contemplated by 11 U.S.C. § 523(a)(6). Injury under this section is a broad category intended to include *inter alia* common law conversion [2] when undertaken with the requisite intention.[3] Not every conversion is willful and malicious. A conversion may be no more than innocent and technical.

---

**2.** The elements for conversion in Wisconsin are developed in cases dating back over a century. The most concise recent definition of the tort is found in *Production Credit Association v. Nowatzski*, 90 Wis.2d 344, 280 N.W.2d 118 (1979) which states:

> 'Conversion is often defined as the wrongful exercise of dominion or control over a chattel.' Conversion may result from a wrongful taking or a wrongful refusal to surrender property originally lawfully obtained. Where, however, there is no wrongful taking

and the defendant rightfully comes into possession of the chattels, a demand by the rightful owner and a refusal by the alleged tortfeasor are necessary elements of the tort. 90 Wis.2d at 353–54, 280 N.W.2d 118. (Citations omitted.)

**3.** 11 U.S.C. § 523(a)(6) is essentially derived from § 17(a)(8) of the Bankruptcy Act, former 11 U.S.C. § 35(a)(8), which included among debts not affected by discharge "liabilities for willful and malicious injuries to the person or

There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

■ The evidence compels a finding that on the occasion of each sale to Phillips except the first and the last three sales to Clayton, Donny sold cows which belonged to Danekas with the intention of retaining the proceeds of those sales as if they were his own to the exclusion of any rights of Danekas. Donny's testimony that some or all of the cows sold to Clayton were his own and not Danekas' cannot be believed. Donny had authority to act as Danekas' agent to sell cattle as necessary for the management of Danekas' farming operation. That authority specified that it be exercised in the name of Danekas and that the proceeds of the sale be made payable to Danekas. Sales of Danekas' cattle in Donny's name with the proceeds payable to Donny evidences a wrongful taking of Danekas' cattle. The failure to deliver the proceeds to Danekas evidences the wrongful exercise of dominion over the property wrongfully taken. Donny has at all times denied Danekas' right to the proceeds of these sales and has refused his demand for return of money received.

The other alleged conversions do not fit as well within the applicable definition of the tort. The evidence supports a finding that the sale of springing heifers to the "young farmer" was undertaken with a perceived urgency due to the close proximity to calving time. Donny's intention was directed to the proper management of Danekas' herd. Donny's attempt to pay the proceeds to Danekas by means of a check which was made NSF by the bank's seizure of funds, does not demonstrate a wrongful exercise of dominion over the proceeds obtained. The subsequent delay in payment between February and August appears to be explained, at least in part, by Donny's inability to raise sufficient monies to make the earlier check good. Similarly Donny's first sale to Phillips appears to have been undertaken upon the terms of the authority for sales given by Danekas. The check was made payable to Danekas and there was no exercise of dominion over the property inconsistent with Donny's authority.

Finally, the collection of rents appears to have followed the form of prior practice between the parties. Evidence of utility expenses offsetting the rents recovered indicates that there were no net proceeds for Donny to take, rightfully or wrongfully. Even if such net proceeds had existed, the holding of and exercising dominion over those rental proceeds until Danekas and Donny could have one of their periodic accountings has been condoned by prior practice and appears to be in every way consistent with the authority given Donny by Danekas.

property of another other than conversion as excepted under clause (2) of this subdivision." Clause (2) excepted from discharge, *inter alia*: "liabilities ... for willful and malicious conversion of the property of another." The drafters of the Bankruptcy Reform Act of 1978 apparently believed that the exception of conversion in § 17(a)(8) and the referral to § 17(a)(2) were circuitous and unnecessary. To avoid the useless distinction between conversion and other torts and to avoid redundancy, all specific reference to conversion was eliminated from the Reform Act as enacted. [Senate Report No. 95 989, 95th Cong. 2nd Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787]. The elimination of the specific reference was not intended to and does not eliminate conversion from the category of "injuries to the person or property." *In re Cummins*, 11 B.R. 222, 224 (Bkrtcy.E.D.Tenn.1981). ("The phrase 'willful and malicious injury' covers a willful and malicious conversion.") (Citations omitted.) See also *In re Simmons*, 9 B.R. 62, 65, Bankr.L.Rep. (CCH) ¶ 67,921 (Bkrtcy.S.D.Fla. 1981). ("Although § 523(a)(6) omits the term 'conversion', it is clear from the legislative history that 'injury' includes conversion.") (Citations omitted.) *In re Harris*, 8 B.R. 88, 93, 7 B.C.D. 437, 440, Bankr.L.Rep. (CCH) ¶ 67,736 (Bkrtcy.M.D.Tenn.1980). ("The phrase 'willful and malicious injury' as used in § 523(a)(6) was intended to include 'willful and malicious conversion.' ") (Citations omitted.) *In re Meyer*, 7 B.R. 932, 933, 3 C.B.C.2d 534, 535, Bankr. L.Rep. (CCH) ¶ 67,777 (Bkrtcy.N.D.Ill.1981). ("This court holds that the phrase 'willful and malicious injury' used in § 523(a)(6) was intended to encompass 'willful and malicious conversion.' ") (Citations omitted.)

■ Having found that Donny converted cattle and their proceeds upon sale in the amount of $10,300 to wit; sales to Phillips $2,400, sales to Clayton $7,900, it remains to be determined whether those conversions were undertaken with the willfulness and malice requisite to a determination of non-dischargeability. Donny suggested that even if the sales were deemed conversions, they were undertaken with benign motives as to Danekas. Despair and necessity created by actions of the bank which seized all funds in Donny's accounts were claimed to be the motivation. Although some cases have held that necessity was a defense to a technical conversion arising from the sale of debtor's property which served as collateral for secured loans,[4] no case has been found in which a debtor selling property in which he had no ownership interest has been excused on the basis of personal needs. Donny knew to whom the property in question belonged, and although there is no reason to doubt his intention to restore the funds at some future date, he knew and intended that Danekas would suffer the loss or risk of loss through his exercise of dominion over the sale proceeds. Willful and malicious in this context does not require that the debtor be motivated by personal hatred, spite or ill will in harming the victim. It is sufficient that the debtor know that an injury will be caused and proceed in the face of this knowledge to carry out the actions which will cause the injury.[5] In this case Donny possessed the requisite intention and knowledge.

Upon the foregoing which constitutes my findings of fact and conclusions of law in this adversary proceeding,

IT IS ORDERED THAT the debt due to the plaintiff from the defendant in the amount of $7,950 is not dischargeable.

Judgment may be entered accordingly.

---

4. *In re Nelson*, 10 B.R. 691, 692, 4 C.B.C.2d 548, 549 (Bkrtcy.N.D.Ill.1981). ("If the Debtors' intent is to raise funds to meet living necessities, as here, the requisite malice is absent.") *In re Hodges*, 2 C.B.C.2d 566, 571 (Bkrtcy.W.D.Va. 1980). ("While he may well have willfully sold the secured property, he did not appear to do so maliciously. Testimony from the Debtor indicated that he did not intend to hurt or harm Grand Piano by selling the goods; he only meant to raise money to make his monthly mortgage payment.") But see *In re Simmons*, 9 B.R. at 66, Bankr.L.Rep. (CCH) ¶ 67,921. ("I also find that the debtor's conversion was malicious in that she acted wantonly, contrary to her duty and purposely prejudicial and injurious to the plaintiffs when, after her check to plaintiffs bounced, she spent plaintiffs' trust funds to pay other bills and to support her family.")

5. See *In re Hinkle*, 9 B.R. 283, 7 B.C.D. 349, 350, 3 C.B.C.2d 878, 881, Bankr.L.Rep. (CCH) ¶ 67,873 (Bkrtcy.D.Md.1981). ("Under the Code, a creditor is required to show that the debtor acted deliberately and with intent to harm the creditor or his property before the debt will be held nondischargeable.") (Citations omitted.) *In re Friedenberg*, 12 B.R. 901, 905, 8 B.C.D. 69, 71–72 (Bkrtcy.S.D.N.Y.1981). It is well settled that for an act to be considered willful and malicious within the meaning of the bankruptcy law, the act need not be based on personal malice. An act will be deemed willful if it is intentional and voluntary. The law implies malice if anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships between people and injurious to another. The phrase 'willful and malicious injuries to the property of another in 11 U.S.C. § 523(a)(6) do [sic] not necessarily connote ill-will or special malice. A wrongful act done intentionally without just cause or a lawful basis is sufficient.' (Citations omitted.) (Footnote omitted.) *In re Meyer*, 7 B.R. 932, 933, 3 C.B.C.2d 534, 535–36, Bankr.L.Rep. (CCH) ¶ 67,777 (N.D.Ill. 1981). ("This court interprets 'willful' to mean 'deliberate or intentional' and 'malicious' to mean 'wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will.' ") (Citations omitted.) *In re McGiboney*, 8 B.R. 987, 989 (Bkrtcy.N.D.Ala. 1981). ("Malicious is not used in the sense of evil, personal ill will or hatred, but simply done consciously and knowingly wrongful, and without just cause or excuse. Intent to harm or injure is not required. Intent to do the wrongful act is sufficient and that constitutes the willful part of the act.")