**In the Matter of Robert F. GRACE, Debtor.**

**FIRST NATIONAL BANK OF NEENAH, Plaintiff,**

v.

**Robert F. GRACE, Defendant.**

**Bankruptcy No. 82–00702.**
**Adv. No. 82–0301.**

United States Bankruptcy Court, E. D. Wisconsin.

Aug. 20, 1982.

**654**

John C. Wenning, Sigman, Shiff, Janssen, Stack & Wenning, Appleton, Wis., for plaintiff.

Nancy M. Rottier, Flanagan, Hildebrand & Reff, Oshkosh, Wis., for defendant.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

First National Bank of Neenah ("First National") seeks to have a debt due to it from debtor Robert F. Grace ("Grace") declared nondischargeable under § 523(a)(6) of the Bankruptcy Code. This particular section states:

> "A discharge under section 727 ... of this Title does not discharge an individual debtor from any debt ...
>
>> (2) for willful and malicious injury by the debtor to another entity or to the property of another entity."

Most of the essential facts are not in dispute. They have been incorporated into a stipulated statement of facts filed with this Court before the start of the trial and were made a part of the evidence. On July 24, 1981, a series of outstanding notes due from Grace to First National were consolidated and incorporated into one note for $14,800 payable on November 2, 1981. As collateral for this note, Grace prepared and turned over to First National an assignment of his portion of a $27,000 note receivable. Grace's share of this note receivable, including principal and interest, totalled $13,700.[1] The timing for the amount due from Grace to First National as being one day after the due date for the $27,000.00 note receivable was intentional. It is undisputed that First National relied upon Grace turning over to it his share of the note receivable. The assignment specifically re-

---

1. The full amount of the note receivable in question was for $27,000 due from SPA Associate Builders to Grace and Bergstrom Enterprises, Inc., each a one-half interest, with interest at the rate of 9 per cent, due on or before November 1, 1981.

cited that the proceeds from this note receivable would be paid directly to First National for the purpose of paying the loan from Grace. Grace acknowledged that he intended to assign the proceeds as collateral and knew that First National was relying upon his compliance with this expressed intention.

When this note receivable became due, Grace promptly collected his portion of the proceeds which had been earmarked for First National. Before doing so, Grace personally assured the payor of the note that these proceeds would be paid by Grace to the Bank in accordance with the provisions of the assignment. However, instead of remitting the funds to First National, he placed them in a checking account at Marine National Bank of Neenah on November 3, 1981, without informing First National. It is stipulated that First National never authorized Grace to use these proceeds for any purpose other than the repayment of the loan. Grace nevertheless proceeded to apply the funds for his own purposes and never made any payment from these funds, or any other funds, to First National in payment of his obligation to the Bank. By the middle of January, 1982, all of the proceeds from the note receivable which Grace received had been fully spent. On March 12, 1982, Grace filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

■ Section 523(a)(6) of the Code is consistent with a similar provision appearing in the former Act. "Willful and malicious injury" is a carry-over provision from the Bankruptcy Act § 17(a)(2) and (8). It is intended to encompass willful and malicious conversion, even though the word "conversion" was omitted when the Code was enacted. *See*, 3 *Collier on Bankruptcy*, § 523.16 (15th Ed. 1979), *In re Wyant*, 80–1192 (N.D.Ind.1981). The conversion of another's property without his knowledge or consent done intentionally and without justification or excuse, to the other's injury, is a willful and malicious injury within the meaning of this exception. On the other

hand, a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from the discharge. 3 *Collier on Bankruptcy, supra*, § 523.16.

■ It is important to point out that § 523(a)(6) contains the words "willful *and* malicious" in the conjunctive, and both elements must be present. There is no serious issue in the case at bar as to whether or not the actions by Grace were willful. Willful means deliberate or intentional, as contrasted with inadvertent or negligent, and it no longer includes the looser standard of "reckless disregard" as adopted in the pre-Code decision of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). H.R. Rep.No.95–595 (95th Cong., 1st Sess. 363–365 (1977); S.Rep.95–989, 95th Cong., 2d Sess. 78–79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The parties in this case fully recognize that Grace's actions were willful.

The crucial issue is concerned with the meaning of "malicious". The principal defense raised by Grace is that his actions were not malicious within the meaning of the Code. Grace contends that there must be a specific intent to do harm and that First National has not proven the existence of such an intent.

■ Before the enactment of the Code, the common law definition of "malice" as set forth in the *Tinker* case was followed. The Supreme Court, in *Tinker*, stated that "malice" for purposes of the Bankruptcy Act, was not defined in terms of hatred, ill will or spite, but meant implied or constructive malice resulting from a wrongful act done intentionally and without justification or excuse. However, after the Code came into existence and in the light of its legislative history, some courts have now reached the conclusion that the meaning of "malicious" was changed and now means an intent to do harm. *In re Hodges*, 4 B.R. 513 (Bkrtcy.W.D.Va.1980),[2] *In re Nelson*, 10

2. *Hodges* is distinguishable, because the Court found that the debtor intended to continue to

make payments to the creditor and held that

B.R. 691, 4 C.B.C.2d 548 (Bkrtcy.N.D.Ill. 1981).[3] On the other hand, there are other courts which have concluded that only the *Tinker* definition of "willful" (namely, reckless disregard was overruled by virtue of the enactment of § 523(a)(6), but that the pre-Code *Tinker* common law definition of "malicious", (namely, wrongful and without just cause or excuse) was left intact. *In re Wyant, supra, In re DeRosa,* 20 B.R. 307 (Bkrtcy.S.D.N.Y.1982), *In re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980). This Court is persuaded by the rationale of these latter cases which continue to apply the *Tinker* definition of "malicious" rather than those cases which apply the more rigid standard requiring an actual and conscious intent to do harm.

It is not so much the particular standard which this Court chooses to adopt in determining whether or not the debt should be discharged, that is critical. Rather, what is more important is a careful analysis of the facts of each particular case and the degree of culpability, if any, which may be involved. It is best to look to the particular circumstances of each case in order to determine the presence or absence of maliciousness, keeping in mind the recognized purpose of the Bankruptcy Code is to provide a "fresh start" for an honest debtor. Whether this Court applies the "wrongful and without just cause or excuse" standard or the "intent to do harm" standard, the result in the instant case, will be the same. Under either criterion, this Court believes that it is not necessary to make a finding that hatred, ill will or spite existed. To require such a finding would place such an insurmountable burden upon an objecting creditor as to render § 523(a)(6) meaningless in most instances. This result would also prove to be a strong deterrent against the free flow of funds in an already depressed lending and borrowing market.

Lenders, faced with the prospects of such a result, would be extremely reluctant to advance funds if it was likely that such funds could so easily be misapplied by borrowers without any remedy to the lenders. What is important for the Court to consider is the degree of "aggravated features" in each case. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1935).

The facts in this case in some respects parallel those in the case of *In re Donny,* 19 B.R. 354 (Bkrtcy.W.D.Wis.1982). In *Donny,* the evidence supported a finding that the debtor disposed of collateral belonging to the creditor with the knowledge and intent that the creditor would suffer the loss. The debtor (Donny) retained the proceeds which he then utilized for his own purposes, due to family problems and business reversals. Donny testified that his actions arose out of despair and necessity to satisfy his personal needs. The Court held that, although it had no reason to doubt Donny's intentions to restore the funds at some future date, the particular debt was nevertheless nondischargeable and constituted willful and malicious injury within the meaning of § 523(a)(6). The Court stated:

> "Willful and malicious in this context does not require that the debtor be motivated by personal hatred, spite or ill will in harming the victim. It is sufficient that the debtor know that an injury will be caused and proceed in the face of this knowledge to carry out the actions which will cause the injury."[4]

A similar result was reached by another bankruptcy court in the Seventh Circuit in the case of *In re Scotella,* 18 B.R. 975 (N.D. Ill.E.D.1982). In that particular case, the Court noted that the debtor knew that by selling collateral consisting of a boat, he would injure the creditor by depriving the creditor of its collateral and that this was done without the creditor's knowledge or

---

the debt was dischargeable. No such finding of a similar intent exists in the instant case.

**3.** Although the Court in *Nelson* accepted the "intent to do harm" definition, it expressed serious reservations by stating that this definition "places an almost insurmountable burden on creditors when their secured property is

sold, and a burden this Court is not entirely comfortable with".

**4.** *See also* the recent case of *In re Ries,* 22 B.R. 343 (Bkrtcy.W.D.Wis.1982) which follows the *Donny* decision.

authorization. The Court stated that if there had been evidence of knowledge or consent on the part of the creditor in this or in previous dealings, the result would have been different. In the absence of such knowledge or consent, the Court held that the debt was nondischargeable and that the debtor had consciously violated the creditor's rights in a wrongful manner and without just cause and was therefore "malicious". In the case at bar, there was likewise no authorization by First National for Grace to dispose of the note receivable proceeds.

The facts before this Court establish that Grace is a person of reasonable intelligence with considerable business experience. He is a high school graduate and has been an active real estate broker since 1968. He has handled numerous residential closings as well as some commercial closings. Over the years, he was involved in many secured and unsecured loans with First National. He knew that First National was relying upon his good faith to collect and then turn over the proceeds to it, based upon a satisfactory long time relationship between the parties. He also knew that his failure to do so, would cause injury to First National.

█ This Court completely rejects Grace's efforts to justify his actions on the basis of "advice of counsel". Aside from Grace's self-serving testimony, there was no other evidence to support this allegation. It is significant that there was no mention of this contention by Grace's counsel in the trial brief submitted on his behalf. Although Grace could have called the one person to testify who could have corroborated his testimony—namely the attorney he claimed so advised him—he chose not to do so. His failure to produce this testimony warrants the inference that any such testimony would have been unfavorable to his position and, accordingly, this Court does not accept this contention. *See*, Federal Jury Practice and Instructions, § 72.16 *Failure to Call Available Witness* (3d Ed.

1977). Even if such testimony had been produced, this Court believes that Grace's actions in spending the money resulted, not by reason of any reliance on legal advice, but because of his particular economic circumstances which caused him to do so. By his own testimony, Grace admitted that, while his attorney's advice made him feel better, he still did not believe it, and he was not confident that his retention of the funds was the proper course of action. Even advice of counsel is no defense when it is self evident (as it was in this case) that a debtor is required to perform a particular act. *In re Nazarian*, 18 B.R. 143 (Bkrtcy.D. Md.1982).[5] In reaching this conclusion, this Court has had the opportunity not only to be apprised of Grace's background but also to observe him on the witness stand.

As a result, the debt due from Grace to First National is declared nondischargeable in the sum of $13,700, which is the amount of the collateral which Grace used for his own purposes and did not remit to First National.

This decision stands as and for findings of fact and conclusions of law in accordance with Rule 752 of the Federal Rules of Bankruptcy Procedure.

---

**5.** In *Nazarian*, the act which debtor failed to do was to list property in his bankruptcy schedule. Although the facts differ from those of the instant case, the underlying rationale is applicable.