In the Matter of Loren V. MISJAK and Monica M. Misjak, Debtors.

AMOCO OIL COMPANY, a Maryland Corporation, Plaintiff,

v.

Loren V. MISJAK, Defendant.

Adv. No. 82–0015.

United States Bankruptcy Court, W.D. Wisconsin.

Jan. 27, 1983.

Gregory E. Scallon, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff.

Russell J. Mittelstadt, Madison, Wis., for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

Loren V. Misjak ("Misjak") operated two gasoline stations leased from the Amoco Oil Company ("Amoco") in Madison, Wisconsin from October, 1977, and October, 1978, respectively, until June, 1981. Amoco provided gasoline for these stations under meter marketing plan ("MMP") contracts with Misjak. The contracts required Amoco to deliver branded gasoline to Misjak's underground storage tanks. Amoco retained title to the gasoline until the gas was pumped from the tanks, at which time title passed to Misjak.

The contract required Misjak to pay Amoco the current tank wagon price when the gasoline was withdrawn. Misjak calculated the amount owed by recording in a station log book the daily pump meter readings indicating the volume of gasoline in each underground tank. Misjak used these readings to prepare weekly meter marketing reports ("MMRs") of the gasoline volume sold which were then forwarded with Misjak's payment to Amoco's regional gas terminal. Almost from the beginning of Misjak's operation of the service stations, he was behind in his payments to Amoco. Sometime in 1978, Misjak began instructing his bookkeeper to complete the weekly MMRs using meter readings dated approximately two weeks earlier in the station log books. Fred Goetz, Misjak's accountant, testified that even prior to the opening of Misjak's second station in 1978, Goetz and Misjak met with John Early ("Early") Amoco's territorial manager, to discuss discrepancies between the gasoline volume sold as shown by the station log books and the amounts paid as shown by the financial records. Misjak's other arrearages to Amoco were also discussed at that time.

As part of his general supervision of Misjak's service station, Early was responsible for auditing Misjak's MMRs. At least three times a year, Early both noted the readings on the tank meters and physically checked the tank volume by inserting a measuring stick into the tank. After Early verified the volume of gasoline taken from the tanks, Misjak was required to pay any outstanding balance for the total amount of gasoline sold in that period. Like other gas station owners, Misjak nearly always owed a payment after the audit because several days would have elapsed since the most recent MMR had been filed. According to Early, the amount due after an audit could fluctuate greatly depending on market conditions in the period since the last MMR. Early conceded that the balance due from Misjak after some audits was a fairly large sum. Misjak always paid any amount due after such an audit. After such payments Misjak's account indebtedness to Amoco on his MMP contracts was in balance and fully paid.

Following computerization of the regional Amoco terminal in May, 1980, personnel there could more carefully monitor deliveries of gasoline and amounts reported sold on the MMRs. In June, 1980, terminal personnel notified Early of a discrepancy in Misjak's account that they deemed to be sizeable. Following a station audit, Early

padlocked all gasoline pumps at Misjak's stations. Other creditors then padlocked the station buildings. Misjak ceased doing business and filed a chapter 13 petition. He later converted to a chapter 7 because his debts exceeded chapter 13 limits. Amoco objected to the dischargeability of Misjak's debt of $85,335.91 for gasoline and other products under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B) and 523(a)(6). By stipulation, this case is to be decided on the basis of the parties' briefs and transcripts of the hearing on Amoco's objection to confirmation of Misjak's chapter 13 plan.

■■■ Section 523(a)(2) provides:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The Seventh Circuit Court of Appeals defined the three elements necessary to preclude discharge under this section. These are:

1.) The debtor obtained money or property through representations known to be false or made with reckless disregard for the truth amounting to willful misrepresentation;

2.) The debtor had an intent to deceive; and,

3.) The creditor actually and reasonably relied on the misrepresentation.

*See Carini v. Matera,* 592 F.2d 378, 380–81 (7th Cir.1979). The burden of proof of these elements is on the party objecting to the discharge. *In Re Hosking,* 19 B.R. 891, 895 (Bkrtcy.W.D.Wis.1982). The standard of proof is clear and convincing evidence. *In Re Trewyn,* 12 B.R. 543, 545–46 (Bkrtcy. W.D.Wis.1981).

There is no actual dispute that Misjak misrepresented the volume readings on the MMRs he submitted to Amoco. Misjak himself testified that the meter readings reported on the MMR on any given date represented readings from some earlier date. Misjak's bookkeeper, Teri Cerniglia, testified that, sometime in 1978, Misjak began instructing her to report meter totals from dates earlier than those which the MMRs ostensibly reported. Accountant Goetz denied knowledge of falsified MMRs; however, he testified that from sometime in 1978 a discrepancy existed between the amounts paid to Amoco for gasoline and the volume recorded as sold in the station logs.

■■■ For a debt to be nondischargeable under § 523(a)(2)(A), the debtor's actions must evince "moral turpitude or intentional wrong." *In Re Crook,* 13 B.R. 794, 797–8 (Bkrtcy.D.Me.1981). Because direct proof of fraudulent intent is rarely available, intent must be inferred from the totality of circumstances. *In Re Schlickmann,* 6 B.R. 281, 282 (Bkrtcy.D.Mass.1980). If an analysis of the circumstances reveals a picture of deceptive conduct by the debtor, an intended falsehood plus the deceptive conduct is sufficient to establish intent. *In Re Clark,* 1 B.R. 614, 617 (Bkrtcy.M.D.Fla.1979), *In Re Donny,* 19 B.R. 354, 359 (Bkrtcy.W.D.Wis. 1982), *In Re Hollock,* 1 B.R. 212 (M.D.Pa. 1979). Each case must therefore be considered individually to determine what indices of an intent to deceive are present.

Other courts have considered inaccurately reported sales of gasoline. In one such situation the station owner unsuccessfully attempted to block the discharge of a $17,-000 note representing an earlier discrepancy between meter readings and amounts of money deposited. *In Re Lambert,* 5 B.C.D. 804 (W.D.Va.1979). Because the evidence

showed that the manager had neither hidden funds nor absconded with the money and that he had always made good on prior discrepancies, having once mortgaged his home to obtain the amount due, the court found the debt dischargeable. *Id.* at 805. A less instructive gas station case was *In Re Williams,* 7 B.C.D. 45 (Bkrtcy.W.D.Va. 1980). Williams sold gas under an arrangement similar to the one used by Misjak and Amoco: title passed and payment was due when the gas was pumped out of underground storage tanks. Williams, however, simply forwarded money without an MMR. After Williams became slow in forwarding his proceeds, the oil company locked the pumps. The court only denied discharge of a debt arising from the "larceny" of gasoline sold after Williams broke the locks and continued sales, characterizing the earlier arrangement as an open account giving rise only to an unsecured debt, not an obligation for fraud. *Id.* at 47. The court did not seriously consider any misrepresentations made by Williams in reporting his sales.

 The totality of circumstances surrounding the misrepresentations in the present case do not provide clear and convincing evidence that Misjak intended to defraud Amoco. First, experience under existing audit procedures would reasonably have led Misjak to believe that backdating MMRs was an acceptable solution to his cash flow problem. Up to the time his pumps were locked, Misjak had no reason to expect any different procedure than in the past. As early as 1978, Goetz had informed Early that a comparison of the volume of gasoline shown on the station records and the amounts paid Amoco suggested Misjak was badly in arrears in his gas payments. Each time Early audited Misjak's tanks, a "tolerable" shortage was discovered and each time Misjak paid the amount due. Early's testimony suggested that he would not question a large volume of sales between the last MMR and the audit because market conditions could produce unusually large sales of gas in any given period. Misjak also believed Early assisted him by mis-

directing or postponing delivery of various reports and payments.

Although Early denied knowledge of or assistance in Misjak's backdating of MMRs, his testimony was evasive and marred by a bad and selective memory of events and details clearly recalled by other witnesses. Amoco contends that the first unacceptable shortfall of which it was aware occurred the first time Misjak's accounts were computer audited by the regional terminal, rather than hand audited by Early. That contention is neither plausible nor supported by corroborating evidence. Amoco's prior pattern of dealing with Misjak had been to repeatedly allow him to accumulate arrearages to be satisfied at the periodic audits. Amoco appeared to have condoned the creation of temporary arrearages. The intention to use a practice which was previously condoned is far short of an intention to defraud.

A common element in those cases in which a debt is found nondischargeable is evidence of retention or misapplication of funds. *See e.g., In Re Donny,* 19 B.R. 354 (Bkrtcy.W.D.Wis.1982); *In Re Hosking,* 19 B.R. 891 (Bkrtcy.W.D.Wis.1982); and *In re Hollock,* 1 B.R. 212 (M.D.Pa.1979). Amoco introduced no evidence showing that Misjak misused or misdirected any funds. Misjak is not unlike the debtor in *In Re Drake,* 5 B.R. 149, 151 (Bkrtcy.D.Idaho 1980), of whom the Idaho court said:

> Defendant was similar to many other insolvent business men who with unrealistic hope of recovery, continue to receive merchandise for resale while insolvent. Such a factual situation does not amount to fraud. There is nothing in evidence indicating the defendant received plaintiffs' vehicles with the then existing and deliberate intent to convert the proceeds of consigned vehicles, to any purpose other than the vain hope of continuing in business.

Neither is there any evidence that Misjak backdated his MMRs for any reason other than to keep the business operating.[1]

1. It is possible that Misjak's continuation of

business during continuing insolvency could in

■ The third necessary element is proof that Amoco relied on Misjak's misrepresentations. Case law has developed two aspects of reliance, reasonableness and extent. Even partial reliance is enough to render a debt nondischargeable, but partial reliance may not be used to fill a gap caused by unreasonable reliance. *In Re Magnusson,* 14 B.R. 662, 668 (Bkrtcy.N.D.N.Y.1981).

■ Partial reliance has been addressed mainly in financial statement cases arising under § 523(a)(2)(B), where the creditor has taken steps to investigate and verify the debtor's representations on his financial statement. *See e.g., In Re Magnusson, supra; In Re Garman,* 643 F.2d 1252 (7th Cir.1980). Because Amoco periodically audited Misjak's MMRs and continuously supervised his station operations through Early, Amoco could at most have partially relied on the representations contained in the MMRs.[2]

Furthermore, creditors have been found unable to reasonably rely on debtor's representations if they have access to the records from which the statement should have been derived. *In Re Wise,* 6 B.R. 867 (Bkrtcy.M.D.Fla.1980). Early had continual opportunity to inspect Misjak's station records and pump meters. He completed periodic audits and was privy to information from Misjak's accountant. Not only was Early able to ascertain the actual volume of Misjak's tanks at any time, in fact he did so, found discrepancies, and condoned cure by payment.

Amoco urged reliance on *In Re Hollock,* 1 B.R. 212 (M.D.Pa.1979), in which the debtor's erroneous inventory reports to the secured party's checker rendered the debt nondischargeable. The checker was physically present and able to personally check the secured inventory. *Hollock* is distinguishable on its facts. In that case, the debtor had taken positive steps to hinder free access to the cartons to be inspected by stacking many cartons in a small dark closet. The facts suggested that without performing the physically cumbersome and time consuming task of removing each carton from the closet, unpacking it, and checking its contents, the checker would have been unable to ascertain Hollock's misrepresentation. In contrast, Early needed only to compare station logs and amounts paid, or to compare MMRs against easily viewable pump meters by scheduling his visit for a date on which Misjak was due to complete a report. Further, despite Early's self-serving denials of knowledge or recollection of meetings with Goetz and discussions with Misjak, Amoco was unable to present clear and convincing evidence contradicting those witnesses who believed that Early was aware that Misjak was backdating MMRs.

■ Amoco also asserts that its allegations support a finding of nondischargeability under § 523(a)(6). That section provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Like § 523(a)(2), this section requires that the debtor's actions evince a willfulness or maliciousness constituting a subjective conscious intent to do harm. *In Re Hunter,* 17 B.R. 523, 528 (Bkrtcy.W.D.Mo.1982). Professor Countryman characterized the intent required under the provisions of the former Bankruptcy Act § 17(a)(2) as follows:

---

itself have misled creditors. *See e.g., In Re Hunter,* 17 B.R. 523, 525 (Bkrtcy.W.D.Mo. 1982). Amoco choose not to argue this point, however, perhaps because Amoco would have had to demonstrate reliance, a very difficult task given their continuous knowledge of Misjak's financial problems.

**2.** In discussing reliance it is important to note that throughout the testimony the parties tended to speak as if three parties existed: Misjak, Amoco, and Early. One must assume, however, that as territorial manager, Early acted as Amoco's agent. Early's actions and knowledge must be imputed to Amoco. Amoco's argument that it was unable to monitor Misjak's MMRs prior to the installation of the regional computer system is without merit. Amoco continually monitored Misjak's operation of his service stations through the auditing and supervision performed by John Early.

A conversion is not excepted from discharge as a willful and malicious injury to property if it is (1) unintentional or (2) intentional, but committed under an honest but mistaken belief that it was not wrongful.

*In Re Lambert,* 5 B.C.D. 804, 805 n. 3 (W.D. Va.1979) (quoting Countryman, *The New Dischargeability Law,* 45 Am.Bankr.L.J. 1 (1971)). Misjak's actions appear to fall into the latter category. For the reasons stated above we find Amoco failed to prove Misjak had the requisite intent, and its challenge to dischargeability under this section cannot be sustained. The complaint must be dismissed. Judgment may be entered accordingly.