In re John D. TINKHAM, d/b/a J.D.T. Enterprises, et al., Debtor.

The STATE OF NEW HAMPSHIRE, Plaintiff,

v.

John D. TINKHAM, d/b/a J.D.T. Enterprises, et al., Defendant.

Bankruptcy No. 82–429.
Adv. No. 82–350.

United States Bankruptcy Court, D. New Hampshire.

March 31, 1986.

Dana Bisbee, Atty. General's Office, Concord, N.H., for State of N.H.

Jerome Silverstein, Nashua, N.H., for debtor.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This matter was tried before the court on November 6, 1985, on the State of New Hampshire's Complaint to Determine Dischargeability of Certain Debts Under Sec-

tion 523(a)(6) and (7) and the debtor's Answer thereto. The State submitted a memorandum of law at trial and subsequently both parties submitted additional memoranda.

Two issues are raised for the court's determination in this proceeding: (1) Whether the criminal fines and civil penalty imposed on the Debtor as a result of his activities on certain New Hampshire property are nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(7); and (2) whether the Debtor's conduct and activities relating to the disposal of liquid chemical wastes at the subject property are "willful and malicious," thus rendering the civil judgment entered against the Debtor in connection with the disposal of such wastes nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

## STIPULATED FACTS

The parties' Pre-trial Statements indicate that they do not dispute the following facts:

1. Between January 1979 and October 1979, the Debtor/Defendant John D. Tinkham ("Debtor"), and his agents transported liquid chemical wastes from Bridgewater, Massachusetts, to property owned by Mary Charpentier of Nashua and located at Gilson Road in Nashua, New Hampshire ("Gilson Road property").

2. During the time period referred to in Paragraph 1, the Debtor dumped these liquid chemical wastes into the ground and ground waters of such property by means of a drain located in a garage on the Gilson Road property.

3. The Debtor was retained by Cannons Engineering Corporation of Bridgewater, Massachusetts, ("Cannons") to dispose of certain of its chemical wastes between January 1979 and October 1979.

4. At all times, the Debtor entered the Gilson Road property with the knowledge and consent to Mary Charpentier or her agents to dispose of the chemical wastes referred to in Paragraphs 1 and 2.

5. In conducting the activities referred to above, the Debtor did business under the following trade names: John D. Tinkham Enterprises; H2O Services; Saratoga Leasing Company; Saratoga Spring Corporation; and Goldwater Ltd.

6. Between January and October 1979, the Debtor disposed of chemical wastes for Cannons.

7. On December 19, 1980, the Debtor was convicted by the Nashua District Court of discharging wastes without a permit in violation of RSA 149:8, III(a), of conspiring to discharge wastes without a permit in violation of RSA 629:3, and of soliciting to discharge wastes without a permit in violation of RSA 629:2, and was ordered to pay $75,000 in criminal fines, of which $40,000 has not been paid or suspended and remains outstanding.

8. As a result of the activities described above in Paragraphs 1 and 2, a civil penalty was entered against the defendant on June 9, 1982 in the civil case of *State of New Hampshire v. John D. Tinkham, et al* (Hills.Sup.Ct. Case No. C–81–291) in the amount of $670,000. Said civil penalty was imposed under RSA 149:19 for "neglect of duty under New Hampshire law not to dispose of waste into the ground water of the State without obtaining a permit." ("Tinkham civil case").

9. As a result of the activities described in Par. 1 and 2, a civil judgment was entered against the Defendant on June 9, 1982 in the aforesaid civil case of *State of New Hampshire v. John D. Tinkham et al.* (Docket No. C–81–291) in the amount of $11,357,000 for cleanup costs which have been or will be incurred by the State of New Hampshire in connection with the site.

10. In said civil case of *State of New Hampshire v. John D. Tinkham et. al.* (Hills.Sup.Ct. Docket No. C–81–291) the State of New Hampshire neither claimed nor was it required to claim or prove, and in fact did not prove, that the conduct of the Debtor in disposing of chemical wastes at the Gilson Road property was willful and malicious, either as to the $75,000 fine,

$670,000 civil penalty or the $11,357,000 judgment.

## ADDITIONAL FACTS

In addition to the foregoing stipulated facts the court determines from the review of testimony and evidence submitted at trial that the following additional facts are established by the preponderance of the evidence:

11. The Gilson Road property was owned at all relevant times by one Mary Charpentier. She allowed on the premises one William Sylvester, who engaged in a general refuse and dumping operation under authority as he testified at trial to the effect "I had permission from the ex-mayor of Nashua to dump anything I wanted to out there." In 1976, the State of New Hampshire moved against Charpentier and Sylvester and ultimately obtained an injunction and consent order restricting their continuing to handle certain refuse and wastes on the property. This appears to have related primarily to the receiving and storage of chemical wastes in sealed drums which thereafter corroded and leaked into the ground.

12. Notwithstanding the foregoing court action and injunction, Sylvester continued to receive drums of industrial waste at the subject premises and in May of 1979 the state again moved in court action to obtain an emergency order restraining any such further activity.

13. In January of 1979, unknown to the state until sometime toward the end of 1979, Sylvester had approached and arranged with the debtor Tinkham to allow the debtor to transport what was described as "wash water" from the Cannons Engineering plant in Massachusetts. Tinkham had previously been dumping these liquids in Manchester, New Hampshire at a permitted site. It was closer, and therefore less expensive, to transport the liquids at Gilson Road rather than in Manchester.

14. From January 1979 until October 4, 1979 Tinkham proceeded, through his agents, to transport and dump thousands upon thousands of gallons of liquid waste at the Gilson Road property. The procedure was to have the tanker truck pull into the garage located on the property; attach a hose to a hole in the garage floor that proceeded by a pipe to a culvert behind the garage; and thus discharge the liquid material through the pipe and culvert into the ground behind the garage. Tinkham was aware that this was the method of disposal being used by Sylvester at the site, although on at least one occasion Tinkham advised one of his drivers that Sylvester had a "tank farm" in the ground behind the garage to receive and contain the liquids being transported.

15. Tinkham and Sylvester continued the process of transporting and dumping the "wash water" from the Massachusetts firm during the period indicated, with no interruption in that operation notwithstanding the action by the State of New Hampshire in May of 1979 relating to the receipt and storage of sealed drums to Sylvester. Tinkham himself never transported or delivered any sealed drums of chemical wastes to Sylvester.

16. Tinkham ceased transporting liquid waste to the Gilson Road property after October 4, 1979 because on that trip his drivers noted that local and state police cars were "tailing" them during that delivery.

17. The testimony received at trial establishes that the dumping of the chemical waste in question involved seriously toxic and hazardous chemicals which created the most serious environmental contamination problem in New Hampshire to date. The chemicals not only contaminated the ground waters underlying the Gilson Road property, but also infiltrated into surrounding waters and streams, with the result that a wide area of adjoining property has been likewise seriously contaminated. The State of New Hampshire has exercised eminent domain to take over the contaminated area and is in the process of a long-term neutralization of the toxic effects of the dumping in question. The State to date has actually spent in excess of ten million

dollars in this procedure, and it is estimated that another three million to four million dollars will be required to completely correct the problem.

18. In the civil action which resulted in the civil penalty and the judgment for damages against Tinkham, as well as against Charpentier, Sylvester, Tinkham's corporate firm "Chem Waste, Inc.", and the Massachusetts firm "Cannons Engineering Corp.", the jury entered special verdicts finding specifically that Tinkham, together with the others, was "responsible for creating a public nuisance at the public waste site"; and that Tinkham together with the others "created conditions at the Gilson Road site that constituted an imminent and substantial hazard to the health of persons or to the environment as the result of the disposal of chemical wastes...."

19. At trial the State preferred to refer to the liquids in question as either "toxic wastes" or "hazardous wastes" while the debtor chose to refer to the same liquids as "industrial waste." One of the State's expert witnesses testified that "toxic wastes" are the same thing that everybody referred to as "industrial wastes" until recent years saw the growth of an active environmental cleanup movement on the state and federal levels. Chapter 149 of the New Hampshire Statutes, the pertinent statutory provision, refers only to "sewage" and "industrial waste" and then defines "other wastes" as meaning "garbage, municipal refuse, decayed wood, sawdust, shavings, bark, lime, ashes, offal, oil, tar, chemicals and other substances other than sewage or industrial wastes, and any other substance harmful to human, animal, fish or aquatic life." *N.H. Revised Statutes Annotated*, § 149:1 (Definitions).

20. Tinkham was originally approached by Cannon Engineering to haul and dispose of liquids in 1977 or 1978. Before that time Tinkham had been primarily engaged in hauling septic wastes, i.e., hauling sewerage from septic tanks. He and his companies had permits to dispose of such wastes in a "municipal manhole" in Manchester.

21. Tinkham was told by the Cannons people that the liquid to be hauled was the "separated water" that resulted from processing oil spill materials. However, in the spring of 1979 Tinkham became aware that the "water" being hauled from Cannons in fact had oil in it. This became apparent when he noticed that his Londonderry premises, where the Tankers were flushed out between uses had pools of oil upon the ground after the snow had melted.

22. Tinkham himself called State of New Hampshire officials to his Londonderry premises to ask about the proper method to flush out and handle the residue from his tankers. These officials advised him that the liquid coming from Cannons did in fact contain hydrocarbon contaminants.

23. Sylvester on one occasion asked Tinkham where the "wash water" was coming from and Tinkham told him in effect that it was none of his business. Tinkham also indicated on several occasions that he didn't care where the liquids were going since "he paid Sylvester to dispose of it."

24. Cannons paid Tinkham approximately $75,000 between February and December of 1979 for the hauling and disposal of the liquids at the Gilson Road site.

25. Tinkham was also convicted in Massachusetts at or about the same time he was convicted in New Hampshire for dumping of liquids hauled from the Cannons Engineering operation. Tinkham was imprisoned in Massachusetts prisons from February 1981 to December 1981; and he was then imprisoned in the New Hampshire prison from December 1981 to June of 1982.

26. Tinkham was 30 years old in 1979. He had a ninth grade education and engaged in the gravel business when he first started out. He did very well financially in that business and in the 1970's expanded into the waste hauling business.

27. Entirely apart from the Gilson Road dumping operation, Tinkham and his Company engaged in a fraudulent scheme with Cannons Engineering by which one of Tink-

ham's companies filed false reports with the Massachusetts Agency indicating that the company was disposing of wastes at the Cannons Engineering plant. Tinkham also engaged in the buying of certificates of disposal from Cannons which he knew to be illegal. He had stated that he did not mind engaging in that scheme because it "was only a misdemeanor."

## FINE AND CIVIL PENALTY

■ Upon the foregoing facts there can be no serious question as to the nondischargeability of the criminal fines imposed against the debtor in the state court proceedings. Bankruptcy Code § 523(a)(7) renders debts nondischargeable to the extent that the debt is "for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss...." Although claiming that the $40,000 remaining to be paid of the criminal fines imposed against him is dischargeable, Tinkham has offered no factual or legal grounds to support that contention. Accordingly, the court will enter an order determining that the criminal fine obligation of $40,000 remaining unpaid is nondischargeable by this bankruptcy proceeding.

■ With regard to the civil penalty of $670,000 imposed under the state court civil judgment, Tinkham again argues that that obligation is dischargeable here. As to this civil penalty, Tinkham's contention seems to be that the penalty was in reality a compensation for actual pecuniary loss within the meaning of § 523(a)(7). However, the record establishes that the jury in the civil action imposed the civil penalty under the enabling statute, RSA 149:19, which provides a maximum civil penalty of $10,000 per day for each day of violation for the discharge of waste without a re-

quired permit. The jury's civil verdict against Tinkham imposed a fine of $10,000 per day for 67 days of violation, totaling the $670,000 civil penalty in question. The jury by *another* special verdict granted judgment for the *actual* damages suffered by the State in terms of "amount of expenses that the State has incurred to date.... [and].... the amount of expenses that the state will probably incur in the future" to a total amount of $11,357,000. It is obvious therefore that the additional $670,000 civil penalty was in fact a true "penalty" in the sense of "punishment" and not an attempt reimburse a governmental unit for actual pecuniary loss. *Cf.*, *In re Daugherty*, 25 B.R. 158 (E.D.Tenn. 1982); *In re Tauscher*, 7 B.R. 918 (E.D. Wis.1981). The court therefore in its order will likewise determine that the civil penalty in the amount of $670,000 is nondischargeable pursuant to Bankruptcy Code § 523(a)(7).

## DAMAGE JUDGMENT

The more difficult question presented by this proceeding relates to whether Tinkham's actions in this matter, which resulted in the $11,357,000 civil action judgment against him, involved activity that can be characterized as "willful and malicious" within the meaning of § 523(a)(6) of the Bankruptcy Code. This in turn resolves itself ultimately down to the factual question, as we shall see from the discussion of the legal authorities below, as to whether Tinkham not only knew and intended to transport the chemicals in question without required statutory permits, but also that he intentionally deposited the chemicals on the subject property knowing that this action would cause "injury by the debtor to another entity or to the property of another entity."[1]

---

**1.** It is noted that unlike the usual case of a § 523(a)(6) violation the injury here involved does not relate to the property of the objecting creditor. However, the statute as drafted does not require that the injury be to the property of the creditor as long as injury to "another entity" is involved. Although there appear to be no cases applying the statute in this precise context,

and neither party has been able to cite any such decisions to the court, the court ruled at the pre-trial conference that the statutory language does permit the State of New Hampshire to assert the nondischargeability of the obligation to itself notwithstanding the fact that the injury originally occurred to property owned by anoth-

The term "willful and malicious injury" has been interpreted to mean a deliberate action in which the actor knows his action will result in injury to another person or his property. *United Bank of Southgate v. Nelson,* 35 B.R. 766, 776–777 (N.D.Ill. 1983); *In re McCloud,* 7 B.R. 819, 825–826 (Bankr.M.D.Tenn.1980); *In re Scotella,* 18 B.R. 975, 977 (Bankr.N.D.Ill.1982); *Matter of Klix,* 23 B.R. 187, 189–190 (Bankr.E.D. Mich.1982); *In re Donny,* 19 B.R. 354, 359 (Bankr.W.D.Wis.1982); *Matter of Chambers,* 23 B.R. 206, 210 (Bankr.W.D.Wis. 1982). A conflicting line of decisions appears to employ a less stringent standard of "reckless disregard" or "gross negligence" typically and factual circumstances in which morally reprehensible conduct is involved. See, e.g., *In re Jordan,* 47 B.R. 712, 716 (Bankr.N.D.Oh.1985); *In re Auvenshine,* 9 B.R. 772 (Bankr.W.D.Mich. 1981); *In re Wooten,* 30 B.R. 357 (Bankr.N. D.Ala.1983); *In re Rines,* 18 B.R. 666 (Bankr.M.D.Ga.1982); *In re Thomas,* 47 B.R. 27, 33–34 (Bankr.S.D.Ca.1984).

It appears to the undersigned that decisions taking this latter tack are either straining against the legislative language, to accomplish a desired result of excluding a morally reprehensible bankrupt from a discharge, or result from a misreading of the original Supreme Court decision defining "willful and malicious" for this statutory purpose in the case of *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). The actual holding in the *Tinker* case clearly required the showing of a deliberate act, knowing it would inflict injury, to render the resulting obligation non-dischargeable. It is true that the Supreme Court in that decision used some language—which was surplusage to its actual holding—from which a line of "reckless disregard" cases has been spawned.[2]

The lack of any authority stemming from *Tinker* to support a standard less than "a deliberate act knowing that harm would be inflicted" is well set forth by Judge Watson in his recent decision in the case of *In re Reeves,* 56 B.R. 472, 476–477 (Bankr.N.D. Ala.1985) in which he states:

> To the writer, it appears unfortunate that *Tinker v. Caldwell* was injected into the debate by the reference in the congressional reports and, necessarily, in the court opinions which followed. *Tinker* appears to suffer from the same treatment as the Holy Bible and the United States Constitution in being often cited but rarely read.
>
> In *Tinker,* the wrongful injury was addressed in the now somewhat passe' action of "criminal conversation with the plaintiff's wife." The Supreme Court opinion goes into great detail in pointing out that the action was, originally, a "trespass" or an "assault *vi et armis*" which produces "an injury to the personal rights and property of the husband," on account of which he may recover "for his wounded feelings and honor, the defilement of the marriage bed, and for the doubt thrown upon the legitimacy of children." The author, Justice Peckham, further clarified the wrongful act in *Tinker* by pointing out that the wife's consent was immaterial "because the

---

er entity at the time of the "willful and malicious" actions alleged.

**2.** A great deal of confusion in this area has been created by a perplexing and completely ambiguous reference in the congressional committee reports relating to § 523(a)(6) in the enactment of the 1978 Bankruptcy Code which purports to "overrule" the *Tinker* case under the apparent belief by the committee that that case held that a "reckless disregard" standard or some looser standard than deliberate intent, applies to this nondischargeability issue. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 989, 95th Cong. 2nd Sess. 77–79 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787. The

misunderstanding by the committee as to the *Tinker* decision is well set forth in *In re Simmons,* 9 B.R. 62, 65–66 (S.D.Fla.1981). Moreover, the committee's statement is surplusage and irrelevant inasmuch as the statutory language in the 1978 Code was not changed in any material aspect from the language that was in effect in 1904 at the time of the *Tinker* decision. It is therefore inappropriate for the courts to consider this type of "legislative history" as being of any use in construing the statutory language in question. See *Federal Electric Corp. v. Dunlop,* 419 F.Supp. 221, 225–226 (M.D.Fla. 1976).

wife is in law incapable of giving any consent to affect the husband's rights as against the wrongdoer...."

The opinion in *Tinker* can only be said to deal with the dischargeability question raised by an absence of any proof of specific ill will toward the husband on the part of the debtor. The Supreme Court merely held that such proof was unnecessary because the debtor's misconduct was (by legal fiction) a direct and forceable trespass against the creditor and, being both intentional and severely wrongful, the injury to the creditor was "willful and malicious" as stated in the exception to the debtor's bankruptcy discharge. Simply stated, *Tinker* has never stood for any doctrine whereby the legal consequences of an act rest upon an implication that the doer by virtue of committing the act, exhibited a reckless disregard of the probable harmful consequences of the act.

The confusion in this area is also compounded by the failure to distinguish between "intent" in the sense that the primary purpose of the action is the harm inflicted, and the equally applicable concept of "intent" where the primary purpose of the action is some other objective but where the harm inflicted is known to be a necessary result of the action. In both cases it appears to me that for the statutory purpose of § 523(a)(6) the actor can be charged with "willful and malicious" conduct in that he acted deliberately with the intent of causing the harm in question. This should be so whether or not the harm itself was the *primary* purpose of his action. Cf. Holmes, *The Common Law*, pp. 57–59 (1881).

In the absence of any First Circuit decision on point, this court adopts as the better reasoned approach the Eighth Circuit's decision and rationale in *In re Long*, 774 F.2d 875 (8th Cir.1985). In that case, the Eighth Circuit defined the elements of the § 523(a)(6) exception as follows:

Prior to the enactment of the new Bankruptcy Code, the leading cases on willful and malicious injury in a bankruptcy sense were *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), and *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *Tinker* held that a "malignant spirit" was not an essential element of malice, but that any intentional act which is "wrongful in and of itself, and which necessarily causes injury ... may be said to be done willfully and maliciously." *Tinker*, 193 U.S. at 487, 24 S.Ct. at 509. Hence, the *Tinker* court found that "the law implies that there must be malice" in a debt resulting from "criminal conversation" with a judgment creditor's wife. *Id.* at 490, 24 S.Ct. at 510. Justices Brown, White and Holmes dissented without opinion.

In *Davis*, the debtor sold a car in which the creditor had a security interest without obtaining the contractually required consent. *Davis*, 293 U.S. at 330, 55 S.Ct. at 152. Despite the conversion, the Court, speaking through Justice Cardozo, found the debt dischargeable absent "aggravated features." *Id.* at 332–33, 55 S.Ct. at 153. It was thus established that a conversion of property (a simple interference with legal rights) is not enough in itself to prevent discharge of a debt. It has not been established, however, precisely what type of conduct is sufficiently egregious to constitute malice in this context. Moreover, a distinct tension has arisen between the requirement of "aggravated features" in *Davis* and language in *Tinker* which has been interpreted as applying a "reckless disregard" standard. This tension has recently been particularly perplexing to bankruptcy courts in the category of cases involving breached security agreements. *In re Kimzey*, 761 F.2d 421, 425 (7th Cir.1985).

\* \* \* \* \* \*

The difficulty which the lower courts are currently encountering in applying § 523(a)(6) seems attributable, at least in part, to the frequent failure to separately analyze the elements of malice and willfulness. Despite the general difficulty in

applying the § 523(a)(6) exception, there is a virtual consensus of opinion that "willful," standing alone, means intentional or deliberate. *See, e.g., Matter of Morgan,* 22 B.R. 38, 39 (Bkrtcy.D.Neb. 1982); *In re Tanner,* 31 B.R. 338, 339 (Bkrtcy.S.D.Fla.1983). It is the definition of malice, or the disregard of it as a separate term, which has been troublesome.

Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances," under *Davis* and its recent progeny.

Having determined that a heightened level of culpability must be found, going beyond recklessness and beyond intentional violation of a security interest, we turn to the task of articulating a workable standard. The bankruptcy courts have frequently attempted to define this level of culpability by speaking in terms of intentional harm. Malice is thus being given a meaning more nearly coinciding with common usage. One perceptive case turns to the Restatement (Second) of Torts, § 8A, Comment b, and uses intentional harm as a requirement for the bar to discharge, with the qualification that the expected harm must be "certain or substantially certain" to occur. *In re Fercho,* 39 B.R. 764, 766 (Bkrtcy.D.N.D.1984). The Restatement observes that this is a stricter test of fault than the standard of recklessness. It is also consistent with the previously quoted *Tinker* language, allowing a finding of malice when conduct *"necessarily causes injury."* 193 U.S. at 487, 24 S.Ct. at 509 (emphasis added).

*Id.,* 774 F.2d at 879, 880–881.

This basic analysis is also set forth very well by Bankruptcy Judge Hill in *In re Fercho,* 39 B.R. 764, 767 (N.D.1984), as follows:

> While the wilful and malicious standard of section 523(a)(6) does not require the presence of personal hatred, spite or ill will, there must have been a wrongful act done intentionally without just cause or excuse, and with the intent to injure another. *See In re Thomas Carlton Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va. 1980); *In re Jess L. Hawkins, Wanda Hawkins,* 6 B.R. 97 (Bkrtcy.W.D.Ky. 1980). The term "malicious" has been further defined to require knowing wrongfulness or knowing disregard of the rights of another. *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), *Bennett v. W.T. Grant Co.,* 481 F.2d 664 (4th Cir.1973). *See also In re Tanner,* 31 B.R. 338 (Bkrtcy. S.D.Fla.1983). Citing the case of *In re Donny,* 19 B.R. 354 (Bkrtcy.W.D.Wis. 1982) holding that an injury is wilful and malicious if the debtor knew that an injury would be caused and proceeded in the face of this knowledge to carry out the actions which would cause such injury. The restatement (second) of torts, section 8a, comment b, is instructive in determining whether such an intent to harm is present, stating:
>
>> All consequences which the actor desires to bring about are intended.... Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness....

As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence....

■ I therefore conclude that to establish a ground for nondischargeability of a debt under § 523(a)(6) of the Bankruptcy Code it must be proven that the debtor engaged in deliberate acts which he knew were certain or substantially certain to result in injury to property. If this is established the debt will remain nondischargeable even though the resulting harm was not the *primary* purpose of the intentional acts.

Applying this standard to the present case, it is apparent that the mere fact that Tinkham dumped liquid wastes at the Gilson Road site without the required permit does not *ipso facto* render his actions "willful and malicious" within the meaning of § 523(a)(6) of the Bankruptcy Code. It is also clear as an objective fact that the liquid waste in question were "certain or substantially certain" to cause injury to the property and surrounding area upon which they were dumped. The crux of the decision which this court must make therefore is whether the evidence sustains a finding that Tinkham was aware during the period of January through October of 1979 that such dumping *would* result in such injury.

■ On this narrow question the evidence is closely divided. On the one hand Tinkham's actions with regard to the Gilson Road site indicate that he was aware that something was not quite right about dumping the liquids in the manner that was employed by Sylvester, and that a permit probably would not be granted if requested for that specific type of dumping. He also knew, at least as early as the Spring of 1979, that the so-called "wash water" he was receiving from Cannons Engineering did in fact contain contaminants. On the other hand, it is believable, as Tinkham testified in the state civil and criminal proceedings, that at least in terms of the common knowledge available in 1979 he did not know that the liquids that he was transporting from Cannons Engineering to the Gilson Road site would cause injury and damage to the property in question in anything like the magnitude that actually occurred. The fact that he himself called in the state officials to examine his tankers and the liquid in question at the Londonderry site tends to corroborate his lack of any clear understanding that the chemicals in question had any seriously toxic effects.

The evidence being closely divided on this key question, I conclude that the preponderance of the evidence does not support a finding that Tinkham knew that damages aggregating in excess of $11,000,000 were "certain or substantially certain" to occur to the property in question as a result of his actions. In reaching this determination I am also mindful of the general guidance that the bankruptcy court in determining whether a debt comes within one of the exceptions of § 523 should proceed on the basis that "the statute should be strictly construed against the objecting creditor and liberally in favor of the debtor." *3 Collier on Bankruptcy*, 15th ed. § 523.05A, p. 523–15 (1985) (and case decisions cited therein).

It also should be noted that the determination here reached has been made in terms of the particular facts pertaining to this debtor and also in terms of the state of common knowledge of the toxic effects of various industrial wastes that obtained in New Hampshire in 1979; and in terms of the lesser degree of regulatory activity that existed at that time. If these actions had occurred at the present time, in the present atmosphere of clear public awareness of the severe toxic effects of many chemical industrial wastes, the inference as to what the debtor "knew was substantially certain to occur" by virtue of his dumping activities might well have been otherwise.

A separate judgment shall be entered in accordance with the foregoing findings and conclusions.