**In re Martin Lee HAUGSRUD, Debtor.**

**ESTATE OF Muriel BURNHAM, Plaintiff,**

**v.**

**Martin Lee HAUGSRUD, Defendant.**

**Bankruptcy No. 85–497.
Adv. No. 86–14.**

United States Bankruptcy Court,
D. New Hampshire.

Aug. 27, 1987.

Ernest P. Sachs, Davis, Rounds & Sachs, Norwich, Vt., for plaintiff.

Kevin Bruno, Woodsville, N.H., John Morale, Wells River, Vt., for defendant.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding brings before the court the complaint by the Estate of Muriel Burnham, a woman injured and killed in an automobile accident involving the debtor-defendant, that the Estate's claim for damages against the defendant for Muriel Burnham's injury and death are nondischargeable under § 523(a)(6) of the Bankruptcy Code. David Burnham and Douglas Burnham are the Administrators of the Estate of Muriel A. Burnham and are the holders of a disputed, unliquidated claim against the debtor based upon the debtor's alleged tortious liability in causing the personal injury and eventual death of Muriel Burnham. It is the plaintiff's contention that the debt arising from the motor vehicle collision in question is the product of debtor's willful and malicious behavior and therefore excepted from discharge by the provisions of 11 U.S.C. § 523(a)(6).[1]

The section of the Bankruptcy Code in question provides as follows:

*§ 523. Exceptions to Discharge.*

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(6) For willful and malicious injury by the debtor to another entity or to the property of another entity ...

The underlying pleadings in this adversary proceeding are the plaintiff's Complaint to Determine Dischargeability Of Debt in which the plaintiff Estate prays that the defendant's alleged indebtedness to the plaintiff be found nondischargeable pursuant to 11 U.S.C. § 523(a)(6), that this court enter judgment in favor of the plaintiff and against the defendant in the amount of $1,000,000.00, that judgment be entered against the defendant. In the alternative, the plaintiff's Complaint prays that the matter of the underlying debt be transferred to the Vermont Superior Court for determination.

The debtor-defendant filed an Answer to the plaintiff's Complaint and also a Counterclaim. The defendant's Counterclaim alleges a violation of the automatic stay which protected the debtor subsequent to his bankruptcy filing, by the plaintiff Estate in its filing of a Motion to Amend Complaint dated November 25, 1985 with the Windsor, Vermont Superior Court. The defendant's Counterclaim prays for an award of the damages, costs and attorney's fees flowing from the alleged stay violation. The Estate of Muriel Burnham filed a Reply to defendant's Counterclaim requesting that this court dismiss same.

The court tried this matter on the merits over a two day period—March 25 and March 26, 1987. The court reserved for a further hearing, additional evidence on damages in the event that the claim in question is found as a matter of law to be nondischargable. Following the March 25, and 26, 1987 trial of this adversary proceeding, the court set forth separately its Findings Of Fact under date of March 30, 1987. Further, by Order dated March 30, 1987, the court allowed the plaintiff further time in which to submit a post-trial memorandum of law with regard to the facts as found by the court, with the defendant having additional time in which to reply to same, and also providing that the plaintiff would have an additional ten days there-

---

1. The events in this case occurred prior to the July 10, 1984 amendment adding § 523(a)(9) to the Bankruptcy Code rendering debts stemming from DWI incidents nondischargeable.

after in which to file any reply memorandum it so desired.

### FACT FINDINGS

The court herein merely restates its Findings Of Fact as originally set forth under date of March 30, 1987, so that this matter may be more fully understood in its entirety. The court's Findings Of Fact were and are as follows:

1. On Saturday, April 28, 1984, the debtor-defendant returned at approximately 3:30 p.m. to the apartment in North Haverhill, New Hampshire at which he was living with one April Whittemore and her baby son.

2. The debtor drank one can of beer while at the apartment and he and Whittemore and the baby left at approximately 4 p.m. in the debtor's pick-up truck for Claremont, New Hampshire.

3. The debtor drove approximately four miles north to Woodsville, New Hampshire where he stopped at a store to pick up a six-pack of beer. He then proceeded across the Vermont state line to get on interstate highway I-91 and proceeded south on the highway.

4. During the drive on the interstate highway the debtor consumed an additional four cans of beer while driving.

5. While on the interstate highway the debtor drove at a normal rate of speed and drove in a normal manner.

6. He arrived at Exit 9 just north of Windsor, Vermont shortly before 5:25 p.m. and got off the interstate to get some gas in Windsor. He proceeded south on Route 5 into the northern outskirts of Windsor and intended to turn left off of Route 5 into a Shell gas station. At this point the highway runs due north and south in a straight stretch of approximately one-quarter mile in distance. The weather at the time was clear and the pavement was dry.

7. As the debtor started to turn across the northbound lane to enter the Shell station on the east side of the road, his passenger, April Whittemore, shouted "Don't turn! You'll hit her!" referring to a Oldsmobile automobile coming towards them in the northbound lane. The debtor responded "Shut up. I know what I'm doing." and proceeded to turn into the north bound lane.

8. The debtor's truck collided with the Oldsmobile, striking the Oldsmobile on its left side at the driver's door with sufficient force to flip the Oldsmobile over and deposit it upside-down on the ditch at the side of the highway.

9. The skid marks from the debtor's truck, and from the Oldsmobile trying to avoid impact, indicate that the point of impact was approximately two feet from the east side of the northbound lane of Route 5. A police officer's testimony corroborates the fact that the debtor's vehicle struck the Oldsmobile while the latter was trying to avoid the impact. I do not find credible the debtor's contrary explanation for the skid marks.

10. After the collision the debtor pulled his truck into the Shell station, got out, and immediately proceeded south on Route 5 on foot. He did ask April Whittemore before he left whether she was hurt. He made no attempt to determine whether the occupants of the Oldsmobile were injured. He did not summon help from the police or an ambulance. April Whittemore called out to a motorist who had stopped, and that motorist called for the police and ambulance.

11. The plaintiff's decedent, Muriel Burnham, a 65 year-old woman, was driving the Oldsmobile and was critically injured in the accident. She died some 53 days later from injury received in the collision.

12. The debtor proceeded on foot all the way through Windsor and down to the highway which crosses over to Claremont, New Hampshire—a considerable distance. He arrived at his mother's home in Claremont, New Hampshire at approximately 10 p.m. At that time he exhibited no smell of alcohol on his person nor any effects of intoxication. He was upset about the accident.

13. April Whittemore had informed the police as to the name of the driver and the police arranged to interview the debtor at

the Claremont residence later that evening at his mother's home. He was polite and cooperative in the interview.

14. The debtor was charged with having caused an accident resulting in serious bodily injury to the occupant of another vehicle and failing to immediately stop and give his name, residence, license, etc., to the person injured or a law enforcement officer, in violation of 23 V.S.A. § 1128.

15. The debtor gave no credible explanation for his reasons in leaving the scene of the accident, rather than attending to his own passengers, and inquiring as to the condition of the passengers in the other vehicle. The debtor did testify that he was stopped on the highway and that Muriel Burnham's vehicle struck his vehicle rather than the opposite. However, all the physical evidence and the testimony of the police officer on the scene is to the contrary and I do not find the debtor's testimony credible on this point. Moreover, if in fact he did believe that he was not the cause of the accident, it renders even more inexplicable his leaving the scene without attempting to establish his innocence.

16. The evidence regarding the debtor's drinking during the day in question came from April Whittemore. The debtor testified directly to the contrary that he had nothing to drink on that day. The debtor also put on evidence challenging the credibility of April Whittemore, and particularly relating to her animosity toward him resulting from a subsequent event in which he reported her and her then-husband for child abuse to state authorities. While I believe that April Whittemore does have some lingering animosity towards the debtor, I do not believe that she lied under oath about the consumption of beer on the date in question. Considering the demeanor of both witnesses on the stand, I find her testimony credible, and that of the debtor not credible, on the question of consumption of alcohol by the debtor on April 28, 1984.

17. The court accordingly concludes that the debtor caused the accident in question while his judgment was impaired by consumption of some 60 ounces of beer.

during a period of less than two hours immediately preceding the accident.

18. Even if I were to ignore the evidence of the alcohol consumption by the debtor preceding the accident, I would then still have to conclude that he was guilty of recklessly and wantonly causing the accident by swerving over into Muriel Burnham's automobile notwithstanding the warning given him by his passenger.

19. The debtor had two prior accidents, in 1975 and 1977, involving loss of control of his vehicle. The latter accident, in 1977, involved driving under the influence of alcohol.

20. The debtor is 32 years of age and is unmarried. He earns $5.25 an hour as a sawyer in a lumber mill. He is a high school graduate. He has assets of less than $450 in value. He had no insurance covering his automobile or personal liability.

21. Muriel Burnham's medical expenses at the hospital before her death were in excess of $90,000.

### ISSUE AND LEGAL STANDARD

The issue presented for the court's determination is whether, on the foregoing facts, the claim of the plaintiff against the defendant is for a debt which is nondischargeable because it is a debt for willful and malicious injury to the plaintiff's decedent within the meaning of § 523(a)(6) of the Bankruptcy Code.

This court has had previous opportunity to consider the meaning of willful and malicious injury as provided in § 523(a)(6). In its case, *In re Tinkham*, 59 B.R. 209 (Bankr.D.N.H.1986) this court established the standard it believed applicable to claims of nondischargeability under § 523(a)(6):

I therefore conclude that to establish a ground for nondischargeability of a debt under § 523(a)(6) of the Bankruptcy Code it must be proven that the debtor engaged in deliberate acts which he knew were certain or substantially certain to result in injury to property. If this is established the debt will remain nondischargeable even though the resulting

harm was not the *primary* purpose of the intentional acts. 59 B.R. at 217.

In the *Tinkham* case there was no question that the debtor's actions in dumping toxic chemicals were deliberate. The issue instead was whether the debtor there had sufficient awareness of the consequences of his actions to justify a "willful and malicious" finding. In the present case the deliberate nature of the debtor's actions is also called into question.

■ I do not agree with the contention by plaintiff's counsel that the Supreme Court in its decision in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), established a standard of "reckless disregard" as sufficient to comply with the statutory requirement in this area. I believe instead that the actual decision in the *Tinker* case, notwithstanding a long history of mis-characterization by some courts and legislative committees, establishes the appropriate standard as being that of a *knowing* disregard with relation to an injury certain or substantially certain to occur. See, generally, *In re Tinkham*, supra, at pp. 213–17. See also, *In re Compos*, 768 F.2d 1155, 1157–58 (10th Cir.1985). On the other hand, I also disagree with the contention by defendant's counsel to the effect that a "drunk driver" can never have the requisite intent and state of mind to justify a § 523(a)(6) nondischargeability determination. I recognize that some courts have apparently so ruled. The conflict on this point, and the pertinent case citations, are set forth in *In re Compos*, supra, at pp. 1158–59.

I think the better approach is exemplified by the decision of Judge Johnson in *In re Cloutier*, 33 B.R. 18 (Bankr.D.Me.1983), in which he made a fact-specific evaluation of the *entire* circumstances surrounding the debtor's drinking and the automobile collision in question before reaching a determination that the liability there was nondischargeable.

■ In the present case, the magnitude of drinking was not as great as that in *Cloutier* but does establish that the debtor consumed five cans of beer over less than two hours while operating a motor vehicle immediately prior to the collision. I conclude that this constitutes "willful and malicious" conduct in the sense that the debtor can be said to have intended the natural outcome of his conduct. Cf. *In re Greenwell*, 21 B.R. 419, 421 (S.D.Ohio 1982). The requisite mental attitude is also indicated by his angry and instant response to his passenger's warning, before swerving in front of the Burnham automobile, and by his conduct thereafter. He parked his vehicle, asked his passenger whether she was injured, and then proceeded to leave the scene of the accident in a manner which conveniently made it impossible for the police to establish his degree of intoxication at the time of the collision. This meant he deliberately left Muriel Burnham to suffer further aggravation of her injuries by lack of immediate attention and care even though that may not have been his primary purpose. The fact that others did subsequently call an ambulance for Mrs. Burnham does not take away from my conclusion that the debtor acted throughout this episode with a "willful and malicious" spirit in the relevant statutory sense.

## CONCLUSION

Based upon all of the foregoing circumstances I conclude that the debtor-defendant's liabilities to the Estate of Muriel Burnham raised in this adversary proceeding are nondischargeable pursuant to § 523(a)(6) of the Bankruptcy Code.

The court shall set down a further hearing to take additional evidence on damages leading to an entry of a final judgment in this proceeding.