In re Z. Jesse BRYL, a/k/a Zdzislawa Murabito, Debtor.

Mark R. MURABITO, Plaintiff,

v.

Z. Jesse BRYL, a/k/a Zdzislawa Murabito, Defendant.

Bankruptcy No. 92–10621.
Adv. No. 92–1079.

United States Bankruptcy Court,
D. New Hampshire.

June 4, 1993.

Nancy Michels, Michels & Michels, Londonderry, NH, for defendant.

Mark R. Murabito, Derry, NH, for plaintiff.

Gerri Karonis, U.S. trustee, Manchester, NH, Jeffrey Schreiber, Schreiber & Associates, Danvers, MA, trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

### I. FACTS

On May 10, 1993 this Court conducted a nondischargeability trial under § 523(a)(5)(B) and 523(a)(6) brought by the plaintiff contending that a certain obligation resulting from divorce proceedings between the plaintiff and the defendant is nondischargeable under the Bankruptcy Code. The obligation in question was included in a decree entered in October 1989 in the divorce court requiring the debtor, Jesse Bryl, then known as Jesse Murabito, to pay the sum of $14,000 to the plaintiff to cover his fees and costs in pursuing and ascertaining the whereabouts of the debtor and their children after the debtor had violated a divorce court order allowing the plaintiff visitation rights.

■ It is uncontroverted that the debtor did in fact take the children and flee the State of New Hampshire without disclosing her whereabouts to the plaintiff or court officials in violation of the state court orders relating to custody and visitation rights. The plaintiff first contends that the obligation was in the nature of maintenance or support relating to the children and therefore is nondischargeable under § 523(a)(5) of the Bankruptcy Code. However, the final divorce decree entered by the state court in July of 1990 explicitly provided for support in the amount of $50 per child and there is no indication in that order or the earlier October, 1989 order that the $14,000 obligation was intended as maintenance or support. On the contrary, the October, 1989 order refers to that provision as a "sanction" for the violation of the divorce court's orders and to reimburse the plaintiff for *his* costs and expenses in tracking down the debtor and her children who had fled to the state of Idaho. Accordingly, as the Court ruled in a bench ruling during the course of the trial, the § 523(a)(5) ground for denial of dischargeability is not supported in either fact or law.

■ The remaining count alleging that the debtor's conduct which resulted in the $14,000 obligation was a willful and malicious injury to the debtor and his property rendered nondischargeable under § 523(a)(6) of the Code raises a more difficult question. The debtor argues that her intent in leaving the State of New Hampshire, while admittedly in conscious violation of the state court's orders, was done because of her sincere belief that the plaintiff had sexually abused her children, notwithstanding both civil and criminal court determinations to the contrary. She further stated that she had no contemplation or intent to injure the plaintiff by causing him the expense of pursuing her to ascertain the whereabouts of his children.[1]

As background, the record indicates both from the documents and the testimony that a divorce proceeding was commenced in 1986 which resulted in a divorce decree in March of 1987. That decree left custody of two children with the wife but gave unsu-

---

1. The plaintiff ultimately was able to obtain custody of the children by subsequent orders of the divorce court.

pervised visitation rights to the husband. Thereafter, during the summer of 1987, the defendant allegedly learned from her daughter that her father was sexually abusing her and made these contentions known to the state court officials. This resulted in a modified custodial order which required supervised visits and ultimately led to a criminal indictment in March of 1988 with a trial and acquittal in the criminal case in November of 1988. Upon the acquittal the defendant immediately took off with the children without disclosing her whereabouts and ultimately was apprehended in Idaho almost a year later. During that time, the plaintiff expended in excess of $14,000 in attorney's fees and other investigative expenses and travel costs in order to track down the whereabouts of his children.

While the defendant at first denied during the trial before me that she understood or knew that the plaintiff would try to find the children and expend monies in that regard, the substance of her testimony under further questioning establishes in my judgment that she knew very well when she left the State of New Hampshire that due to the earlier history of the disputes between the parties, which had become an affair of public notoriety, the plaintiff would in fact take all actions he could to try to locate the whereabouts of his children.

During the trial before me there was considerable accusations back and forth between the plaintiff and defendant with regard to the question of whether or not there ever was any child abuse involved between these parties and their children. But that issue is *not* necessary for this Court to revisit in the present circumstances of this case and the state court proceedings.

On the second page of its October, 1989 order, the state court made the following miscellaneous finding and comment: [her flight from the jurisdiction] "show[s] contempt for this Court's orders...." and that same order also refers to the fact that the

state court in an earlier decree in March of 1987 had found that there was no sexual abuse in the matter. The state court order does indicate that when she fled the jurisdiction she "believed she was doing so to protect the children from alleged abuse."

In the subsequent state court order of July, 1990 the Court found that the evidence then before it "is indeed more congruent of false allegations of abuse then it is of abuse" and referred to the $14,000 obligation from the earlier order as a sanction for violation of court orders. The Court did indicate that it was not completely certain whether the debtor made the false accusation knowing that they were false, or "through the more 'benign' process of seeing and hearing what she wished to perceive and manipulate the situation." The Court also noted that the debtor was a caring and loving mother to her children. The state court then noted that the debtor simply ignored concerns flagged by others with regard to her allegations and reaffirmed its award of the $14,000 against the plaintiff as per the October 1989 original order.

On the record before me this Court has no basis to come to any other conclusion than that reached by the state court to the effect that when the debtor fled the State of New Hampshire in November of 1988 she still probably believed subjectively that the sexual abuse danger to her children existed notwithstanding the various hearings and trials and objective events that occurred beforehand that should have led to questioning that assumption.[2]

## II. DISCUSSION

This Court first defined the standard for determining "willful and malicious intent" for § 523(a)(6) purposes in the case of *In re Tinkham*, 59 B.R. 209, 217 (Bankr. D.N.H.1986). As spelled out in *Tinkham*, and the later case of *In re McLaughlin*, 109 B.R. 14, 17 (Bankr.D.N.H.1989), I adhere to the following standard:

---

**2.** As it subsequently developed in the state court proceedings, the child who had made the original allegation recanted as recited in the final divorce court order.

8

I therefore conclude that to establish a ground for nondischargeability of a debt under § 523(a)(6) of the Bankruptcy Code it must be proven that the debtor engaged in deliberate acts which he knew were certain or substantially certain to result in injury to property. If this is established the debt will remain nondischargeable even though the resulting harm was not the *primary* purpose of the intentional acts.

As applied to the present case there is no question in my mind that the debtor acted intentionally when she violated the state court order and the state court has determined that that action was done with contempt for that court's process.

It is also my judgment that when she fled the jurisdiction she knew, and had to know, that this would cause injury to the plaintiff. It was inevitable in view of the prior disputes and litigation between the parties that he would take all steps possible to locate the whereabouts of his children.

The real issue is whether it can be found that the debtor's intentional actions caused a "malicious injury" to the plaintiff resulting in the $14,000 obligation in question. On balance, I believe that that conclusion can be reached by the preponderance of the evidence before me. In the first place, while her primary intent and motivation in fleeing this state may well have been to protect her children from a perceived danger, that action was contrary to court determinations and orders already reached on that issue and she necessarily had to know that her action was certain or substantially certain to cause financial injury to the plaintiff for the reasons indicated above. *In re Condict,* 71 B.R. 485, 488 (N.D.Ill. 1987.) (upholding bankruptcy court's grant of issue preclusion on 523(a)(6) complaint where marital court had found that debtor's actions were in willful contempt of prior marital court orders). In the second place, on the particular facts of this case, and judging the credibility of these parties as I heard them at the trial, it is apparent to me that there was and is malice in the ordinary sense of that word on the part of the debtor toward the plaintiff which would

indicate that even if the injury to the plaintiff were a secondary consideration in her thinking, at the time that she fled the State, it nevertheless was an intended and malicious injury to the plaintiff within the meaning of § 523(a)(6) of the Bankruptcy Code.

Accordingly, a final judgment will be entered separately finding for the plaintiff on the § 523(a)(6) ground only and determining that the debt in question is nondischargeable.