In re Joseph Anthony **COONEY, Debtor.**

Carol **FOWLER, Plaintiff,**

v.

Joseph Anthony **COONEY, Defendant.**

**Bankruptcy No. 3800393.
Adv. No. 3800124.**

United States Bankruptcy Court,
W. D. Kentucky.

April 2, 1982.

---

Hollis L. Searcy, Louisville, Ky., for plaintiff.

James M. Auser, Louisville, Ky., for defendant.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

A drunken beating in a roadhouse parking lot gives rise to this nondischargeability action in bankruptcy court. The facts have been tried twice. This is the the second opinion to be written in the case.[1] The transcript tells a tawdry tale which must be retold just once more, hopefully for the final time.

Joseph Cooney, after drinking since early that afternoon, found his way to Bill's Supper Club in the south end of Louisville on the evening of August 4, 1977. There he encountered Mr. Woody, a gambling companion in Cooney's debt. A discussion ensued concerning repayment of the indebtedness, with Cooney emphasizing the immediacy of the obligation. The men were seated at the bar with two barstools separating them.

Upon a neutral stool interposed herself the plaintiff in this action, Mrs. Fowler, a frequent patroness of the establishment and a person well known to Woody. As was his custom, Woody bought drinks for Mrs. Fowler, a gesture of beneficence to which Cooney, being owed money, took singular exception.

As the negotiations continued into the night, Mrs. Fowler understandably took the side of her sponsor, occasionally instructing and admonishing Cooney on his choice of language in the presence of the fair sex. To this advice Cooney responded, addressing Mrs. Fowler as a woman of diminished virtue, with the suggestion that she immediately disengage from the deliberations. Some further words ensued, in the course of which Cooney offered himself in a test of manhood against Woody and others present, including another man in his debt and a nearby security guard.

At this point a friendly and prudent bartender intervened with the recommendation that Cooney reposition himself on the opposite side of the circular bar, which recommendation was followed.

Mrs. Fowler meanwhile pressed upon her companion Woody that her virtue was worthy of his defense, a point of view that Woody then carried to Cooney. The locus of the debate then shifted outside to the parking lot, to which the owner of the supper club, a police officer, was promptly dispatched to conciliate the matter. He was able to convince the two men to return to more lighhearted pursuits. They went back inside, their friendship rekindled, where they continued to drink, safely at opposite sides of the bar.

Cooney's spirit of friendship did not, however, extend to Mrs. Fowler. When she left the bar unescorted an hour or so later, during which time Cooney had five or six more drinks, Cooney met her in the parking

---

1. *In re Cooney*, 8 B.R. 96 (1980), considered at some length the threshold question of collateral estoppel, concluding that the state court judgment was not determinative of dischargeability of a debt for willful and malicious injury, and that a full trial would be necessary in bankruptcy court.

lot. There he beat her to the ground and kicked her unconscious. She spent nineteen days in the hospital.

\* \* \*

No amount of editing for civility, of course, can expunge the ugliness of the incident or its aftermath. Mrs. Fowler was frequently returned to the hospital for further treatment of her injuries. She sued and obtained a judgment against Cooney for $50,000 in actual damages. Cooney took bankruptcy. This complaint followed, seeking to have the judgment debt declared nondischargeable because it was a willful and malicious injury.

Concerning the facts as summarized there is no substantial dispute. The assault and the events leading to it are described in more than sufficient detail in the record. Having heard and observed the witnesses and gauged their credibility, the Court is convinced that the facts recited above occurred as they were described.[2]

As for the defendant Cooney, he is absolutely without memory of the assault. His last recollection of August 4, 1977, is that of having returned to the opposite side of the bar, at approximately 10 P.M. The next thing he remembers is waking up in his bed the next morning.

\* \* \*

Liabilities resulting from assault and battery are generally considered to derive from willful and malicious conduct and are therefore nondischargeable in bankruptcy.[3] We have had unfortunate occasion to decide claims based on injuries inflicted by a defendant while in an intoxicated state, and found them to be willful, malicious, and nondischargeable.[4] Our view corresponds

with that of the majority of courts considering the question: What was described in 1977 as "the gathering weight of authority"[5] has become more impressive with the passage of time. It may now be considered as settled law that the wantonness of drunken assault is the legal equivalent of malice. State law agrees.[6]

Here, for the first time before this court, the defense is raised that an alcohol-induced "blackout" prevented formulation of the requisite intent. That temporarily incapacitated state, so goes the theory of the defense, makes impossible any finding of actual malice in the mind of the defendant.[7]

This is the paradigm case for application of the doctrine of implied intent; even if legal reasoning by implication were not known, this would be the case to warrant its invention.

The search for malice is always a perplexing exercise, dealing as it does with a brooding malevolence, a private design for harm, from which society seeks protection in the law. Easy to deny and hard to prove, the secret state of mind may be laid bare, if at all, by reference to the acts of its creator. When the actor has no memory at all, the revelation of intent becomes, even to him, an empirical impossibility. Fortunately the law supplies by implication that which cannot be directly proven.

"You can always imply a condition," said Mr. Justice Holmes. "But why do you imply it?"[8]

The answer is, of course, that legal implications are tools of conclusory logic, designed to justify an appropriate legal resolution of an otherwise insoluble dilemma.

2. Not available in court for cross-examination was the witness Deborah L. Thompson, whose deposition was read into the record. Her testimony is therefore accorded only the slightest weight.

3. See numerous cases cited at 3 *Collier on Bankruptcy*, ¶ 523.16, note 20 (15th Ed. 1981).

4. *Stice v. Schultz*, BK–77–01806–L (W.D.Ky. 1979) (unreported).

5. *In re Keenan*, 3 B.C.D. 697, 698 (1977).

6. See cases cited in *Kaiser v. Pike*, BK–77–02135–L (W.D.Ky.1978) (unreported).

7. At trial, inconclusive references were made to a similar line of defense in criminal proceedings arising out of the same incident, but they were not made part of our deliberations. In fact, testimony concerning the conduct and outcome of the criminal matter were not permitted.

8. O. W. Holmes, *The Path of the Law*, in Collected Legal Papers 181 (1920).

Consider, in the case at hand, the result without the legal implication of malice. Liability could be avoided by the simple defense that the actor had no recollection of his harmful acts. The precedent would invite wholesale mayhem without recourse to the injured. Respect for the law as an organ of social justice would diminish.

In this case there is no proof of medical or psychological nature, other than the defendant's statement that he had never been hospitalized or treated for lapses of memory. Such proof may or may not have facilitated the conclusion reached in this opinion, but regardless, one truth would stand unaltered: The defendant has *not* testified that he had no malicious intent at the time of the assault; he testified only that he *did not remember anything*. The difference is profound. Precise analogy may be made to the computer with a working capacity for data storage but a faulty retrieval system. The errant function does not prove that the information is not there.

The defendant testified that he did not personally know the plaintiff and therefore could wish her no harm, even now. His actions toward her, however, hardly flowed from a compassionate tranquility, nor was it the milk of human kindness that filled him. The incident may have begun as one of those points of inebriant social friction to which the defendant, according to his own testimony, was occasionally a party. But the difference between violent mischief and actual hatred, when reflected upon from a hospital bed for nineteen days, is not much of a difference.

This has been a tragic story, all the more so because the defendant will leave this court burdened with a heavy and nondischargeable debt resulting from one isolated encounter, springing from motives that may never be fully and completely known to anyone, including the defendant himself. The case invites the delivery of a sermon on the evils of drink, a temptation we have been graciously spared by the limited functions of this office and the direct applicability of the doctrine of implied malice.

The judgment debt of the defendant to the plaintiff is nondischargeable. This is a final order, and appropriate judgment shall be entered today.