In re Marvin THIRTYACRE, Debtor.

Jody THORP, Plaintiff,

v.

Marvin THIRTYACRE, Defendant.

Bankruptcy No. 91–82153.
Adv. No. 91–8203.

United States Bankruptcy Court,
C.D. Illinois.

May 19, 1993.

Stephen T. Fieweger, Balch, Lefstein & Fieweger, P.C., Rock Island, IL, for plaintiff.

Gregory J. McHugh, Appleton & McHugh, Aledo, IL, for debtor, defendant.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

JODY THORP (Plaintiff) filed an adversary action to determine the dischargeability of a debt owed her by the Debtor, MARVIN THIRTYACRE (Defendant) arising out of an assault. At the time of the incident, the Defendant was the sheriff of Mercer County, Illinois. He was also suffering from depression. In part, his depression was caused by his suspicion his wife was having an affair with Jim Brokaw (Brokaw), the Chief of Police for the City of Aledo, Illinois.[1] He received treatments for his depression at the Veterans Administration Hospital in Iowa City, Iowa (VA

Hospital). As part of his treatment, the drug Pamelor was prescribed. He was instructed not to drink alcoholic beverages while taking this drug.

Sometime prior to the incident, the Defendant had obtained a tape recording of a telephone conversation between Brokaw and his wife which confirmed in his mind that an affair was occurring. The day before the incident, the Defendant saw Brokaw and his wife driving in the same direction, but in separate cars, which added to his belief about an affair. The day of the incident the Defendant and his wife had an argument and that afternoon the Defendant started drinking. That evening he returned home and struck his wife.

During this period of time Brokaw was dating the Plaintiff. The Defendant wanted to tell the Plaintiff what he thought was going on between Brokaw and his wife. The Defendant went to the Plaintiff's home. No one was present. In the process, the Defendant kicked in the back door.

The Defendant then went to the police station in Aledo, Illinois. Brokaw and the Plaintiff returned to her home and found the damage. Brokaw called the Aledo police department and a telephone conversation between Brokaw and the Defendant occurred. In that telephone conversation the Defendant told Brokaw he was going to return to the Plaintiff's home to physically attack him.

The Defendant returned to the Plaintiff's home. The Plaintiff attempted to intercede, and an altercation ensued between the Plaintiff and the Defendant, with the Defendant striking the Plaintiff. The Aledo police then arrived and subdued the Defendant.

The Plaintiff sued the Defendant in state court and obtained a default judgment for $25,000.00. The Defendant filed a Chapter 7 case in bankruptcy, and the Plaintiff filed this adversary proceeding to have the judgment debt declared nondischargeable as a willful and malicious injury under § 523(a)(6) of the Bankruptcy Code, 11

---

1. Subsequently, the Defendant and his wife were divorced and she married Brokaw.

U.S.C. § 523(a)(6). The Defendant contends because he was taking Pamelor and drinking alcoholic beverages, his mental capacity to form an intent to act in a willful and malicious manner was impaired. The parties stipulated that was the only issue and a trial was held. The matter was taken under advisement and the parties were given an opportunity to file written briefs, which they did.

■ Prior to deciding the substantive issue in this case, three evidentiary issues, also taken under advisement, must be decided. The first evidentiary issue is whether this Court should take judicial notice of the drug manufacturer's pamphlet for the drug Pamelor. This pamphlet contains sections entitled: Description, Actions, Indications, Contraindications, Warnings, Precautions, Adverse Reactions, Dosage and Administration, and How Supplied. The Defendant asked this Court to take judicial notice of the definition of Pamelor. In effect he was asking this Court to take judicial notice of the matters in the pamphlet, including that the drug when taken with an excessive consumption of alcohol may have adverse consequences.

Rule 201 of the Federal Rules of Evidence governs judicial notice of adjudicative facts. It provides:

(a) *Scope of rule.* This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Clearly the pamphlet does not fall within the scope of the rule and should not be admitted into evidence. It cannot be said that the effects of Pamelor when taken with an excessive consumption of alcohol are generally known within the jurisdiction of this Court. As stated in *McCormick on Evidence:*

[T]he more reflective opinions speak in terms of the knowledge of "most men," (footnote omitted) or of "what well-informed persons generally know," (footnote omitted) or "the knowledge that every intelligent person has."

The information contained in the pamphlet does not fall within those standards.

Nor can it be said that the effect of the drug when taken with an excessive consumption of alcohol can be accurately or readily determined by resorting to the pamphlet. It is appropriate to take judicial notice of a proposition of science, but the Defendant's request does not fall within that category. Rather, the Defendant asks this Court to take judicial notice from the pamphlet of the effect on the Defendant of his using the drug while drinking. It does not follow from the pamphlet what the specific effect of the Defendant's use while drinking might be.

As the court stated in *Clark v. South Central Bell Tel. Co.,* 419 F.Supp. 697 (W.D.La.1976):

Furthermore, F.R.E. 201 states that facts may be noticed if they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." For a Court to notice facts judicially, if they are not matters of general knowledge, the sources of those facts must be placed before the Court. If a party places the source before the Court and requests judicial notice, the Court must take it if the facts are susceptible of judicial notice.

This standard of "indisputability" was discussed in Louisell & Mueller, *Federal Evidence,* § 57, Rule 201, p. 437:

Facts may be indisputable within the meaning of Rule 201 because (even though not generally known) they can be verified by resort to sources whose accuracy cannot reasonably be questioned. At one time courts indulged in the obvious fiction of consulting sources to refresh recollection, but it is clear enough that courts in reality simply inform themselves of facts which nobody is likely to carry around in his head from whatever sources the trial judge deems to be unquestionably accurate. Almanacs, encyclopedias, calendars, historical works and

charts tabulating information deduced from the application of the laws of physics form only a part of what must be a list too long to be worth enumerating of sources to which a court may in proper circumstances resort for the purpose of deriving judicially noticeable information.

Discussing the general kinds of indisputable facts, the above authority states:

Historical and geographical/climatological facts are among the more frequent subject of judicial notice. Also noticed are political facts (such as the identity of office holders), facts relating to practices in business and industry, facts relating to the economy and its condition, sociological facts, and scientific and medical facts, where the question often to be answered is whether the fact in question has achieved sufficient acceptance in the scientific community to be considered indisputable.

If the Defendant had submitted information regarding Pamelor that had been obtained from the FDA or a medical dictionary (as he represented it was), then perhaps it would have been admissible. But for this Court to find that the manufacturer's own representations regarding the drug are "sources whose accuracy cannot reasonably be questioned" within the meaning of FRE 201(b) goes far beyond any reported application of that rule. There is no element of objectivity with such an application. In *United States v. Houston*, 4 M.J. 729 (U.S. Air Force Ct. of Mil.Rev.1977), the court held that judicial notice could be taken of a two-page publication setting out information pertaining to the background, pharmacological information, pattern of use, and subjective effects of the drug phencyclidine, finding that the information was factual and could be readily attained from the National Institute of Drug Abuse. The court in that case was willing to go beyond the record and do its own independent verification. In this Court's view, the burden is on the party seeking to have the court take judicial notice of the fact to put the sources before the court and establish their complete accuracy.

■ The next evidentiary issue involves the admissibility of the VA Hospital records. Relying on *Pieters v. B–Right Trucking, Inc.*, 669 F.Supp. 1463 (N.D.Ind. 1987), the Defendant contends they are admissible under the "business records" exception to the hearsay rule. However, the court's reasoning in *Pieters* clearly is contrary to the Defendant's contention. In that case the court stated:

The business records exception to the hearsay rule found in Federal Rule of Evidence 803(6) does not require a showing of chain of custody. In pertinent part, the Rule excludes from the hearsay rule:

[a] memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6). In order for evidence to be admissible under Rule 803(6), it must be "transmitted by" a declarant "with knowledge" in the ordinary course "of a regularly conducted business activity...." *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir.1986). While the Rule requires that a custodian or qualified witness testify that the requirements of the business records exception have been met, there is no requirement that the "qualified witness" must have personally participated in or observed the creation of the document. *United States v. Moore*, 791 F.2d 566, 574 (7th Cir.1986). *See also United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir.1985). "The phrase 'qualified witness' is to be broadly interpreted as requiring only someone who understands the system." (Citations.) In the case of a hospital, evidence

is admissible under the Rule if transmitted by a declarant (such as a doctor or a nurse) who reports to the recordkeeper as part of a regular business routine in which they are participants.

In *Belber v. Lipson*, 905 F.2d 549 (1st Cir.1990), the court reached the same conclusion, holding that medical records were not admissible because there was a lack of testimony by the custodian or other qualified witness, stating:

> This testimony is essential. Without such a witness the writing must be excluded. "Obviously a writing is not admissible ... merely because it may appear on its face to be a writing made by a physician in the regular course of his practice."

The Defendant also relies on *California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342 (C.D.Cal.1983), which dealt with the admission of reports of the U.S. Dept. Health, Education and Welfare. In that case the court held because of the facsimile of the official seal on the cover page, suggesting that the document was printed by the authority of that agency, the exhibit was admissible under Rule 902(5), which provides that official publications are admissible. That case involving official publications has absolutely no relevancy with the business records exception involved in this case.

■ At the trial, the Defendant represented that he had received from the VA Hospital that day an objection to sending someone with the original records. The Defendant's alternative request is that if the records are not admitted, an order be entered to enforce the subpoena or to allow the Defendant's oral request at trial to keep the evidence open to permit him to take an evidence deposition. There are three reasons why this request should be denied. First, the VA Hospital records are cumulative and in that regard, the VA's failure to comply with the subpoena is not grounds for a continuance or to permit the Defendant to supplement the record after trial. *See Harbor Tug & Barge v. Belcher Towing*, 733 F.2d 823 (11th Cir.1984). Second, the subpoena directed to the VA Hospital does not have the box checked: "YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case", but rather directs that "YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below". The Defendant did submit a check for $37.50 with the subpoena, but he did not subpoena a custodian of the records as he should have. Third, there is a subpoena in the file directing the VA Hospital to produce the original records at the courthouse on the day of trial. The Defendant did not disclose this at the start of the trial, however, but brought this up near the end of his case as an alternative theory to get the VA Hospital records admitted. He has waived his right to a continuance by proceeding to trial.

For these reasons the Defendant's VA Hospital records should not be admitted into evidence and the Defendant's request to enforce the subpoena or to allow the Defendant to keep the evidence open to take an evidentiary deposition should be denied.

■ The last evidentiary issue to be decided is whether Dr. Ritterhoff should be permitted to testify. He was not the treating doctor. The Plaintiff relies solely upon the representations made by the Defendant at the final pre-trial conference as grounds for barring the late disclosure of the expert witness. At the final pre-trial conference on October 1, 1992, the Defendant's counsel represented to the Court that he would be calling the Defendant's treating physician from the VA Hospital concerning the Defendant's depression, treatment and medication. On December 15, 1992, the Plaintiff learned that the Defendant was intending to call Dr. Ritterhoff as an expert witness. The trial was held on January 20, 1993.

At the final pre-trial conference, after stating that the single issue was whether the Defendant had the capacity to form the intent required under Section 523(a)(6), the Court inquired of the parties whether they were both going to have medical experts.

Counsel for the Defendant stated that it was the Defendant's intention to use the treating physician at the VA Hospital. He indicated the parties had discussed the matter and they intended to take an evidence deposition of that doctor. The parties then indicated there would be occurrence witnesses as well. The Plaintiff stated that she would not be planning to introduce medical evidence. The parties indicated that they would need 45 days in order to take the evidence deposition. The pre-trial order did not order a disclosure of the parties' witnesses or a cutoff date for the taking of discovery. Absent such a provision in the pretrial order, the Defendant was under no duty to inform her of his expert witnesses. If the Plaintiff had wanted to compel disclosure, the proper procedure would have been for her to serve expert interrogatories pursuant to Fed. R.Civ.P. 26(b)(4). In fact, according to the rules, it is the only way to get such information. When this Court explored the issue at the final pre-trial the Defendant made representations as to his expert. Given the fact that the parties were in agreement that an evidence deposition was going to be taken and none ever was, the Plaintiff should have been on notice something was amiss. Plaintiff found out about the change on December 15, 1992, and the trial was not held until January 20, 1993. That disclosure cannot properly be termed "last minute." At the pre-trial hearing the parties said they only needed 45 days to depose a doctor.

In *Garbelmann v. Creditcard Keys Company*, 1992 WL 73531, 1992 U.S.Dist.LEXIS 5536 (N.D.Ill.1992), the court rejected the plaintiff's argument that the testimony of an expert should be barred because he was disclosed only two months in advance of trial, stating:

> [T]his is not a case where the expert was disclosed literally on the eve of trial. Plaintiffs already have had almost two months to take [his] deposition and to retain an expert of their own in response to [his] proposed testimony. The testimony cannot be excluded simply because plaintiffs have chosen to contest its admissibility rather than to take the steps

necessary to confront that testimony at trial.

This is what the Plaintiff did here. The Plaintiff's counsel met with Dr. Ritterhoff the night before the trial. Whether it was an informal meeting or not is not known. Nor is there any indication that she had been trying to depose Doctor Ritterhoff since learning that he would testify. The Plaintiff did not take any immediate or timely steps to prepare for trial. Either she should have made a record of the fact that she tried to depose the Doctor but could not, or should have promptly filed a motion with the court to bar Doctor Ritterhoff's testimony.

In *Boone v. Moore*, 980 F.2d 539 (8th Cir.1992), the court considered whether the trial court erred in permitting an expert who was named three weeks prior to trial to testify:

> We will not disturb the district court's decision to allow [the doctor] to give expert testimony unless there is a gross abuse of discretion, which resulted in fundamental unfairness at the trial. *Wilson v. Beloit Corp.*, 921 F.2d 765, 768–69 (8th Cir.1990).

In *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 879 (8th Cir.1986), we stated the factors courts should consider in determining "whether to exclude the testimony of a witness not made known in a manner complying with a pretrial order...." Those factors are: (1) the reason the party fails to name the witness; (2) the importance of the testimony; (3) the amount of time opposing party needs to properly prepare for the testimony; and (4) whether a continuance would in some way be useful. *Id.* (applying *Murphy v. Magnolia Electric Power Ass'n*, 639 F.2d 232, 235 (5th Cir.1981)).

The defendants refer us to *Patterson*, but fail to tell us any reason for waiting as long as they did in identifying [the doctor] as an expert witness. For lack of information, we assume it was due to either oversight or simply neglect on their part.

We thus turn to the "importance" of [the doctor's] testimony. If the testimo-

ny is "important" to the party against whom the exclusion is sought, then its "importance" weighs in favor of its inclusion. *Patterson*, 786 F.2d at 879; *Murphy*, 639 F.2d at 235. In the instant case, there is no doubt [the doctor's] testimony went to show that it was highly unlikely Boone's treatment at MTCM caused or had any significant effect on Boone's ear condition.

The court concluded that the trial court's decision to allow the testimony did not amount to an abuse of discretion resulting in a fundamental unfairness to the opposing party.

Allowing Dr. Ritterhoff to testify would not result in a fundamental unfairness to the Plaintiff. At the pretrial conference it was recognized a medical expert would be important to the Defendant's case. Why the parties did not follow up as indicated is not known. What is known is that the Plaintiff had sufficient time to protect herself and didn't. For these reasons the testimony of Dr. Ritterhoff should be admitted.

■ The substantive issue in this case is whether the Defendant had the mental capacity to form an intent to act in a willful and malicious manner, or if that capacity had been impaired by his simultaneous use of Pamelor and alcohol. The starting point on this issue is this Court's ruling on the Plaintiff's motion for summary judgment, based on the default judgment obtained by her in state court, or alternatively, that the Defendant's actions were willful and malicious as a matter of law. After ruling that the doctrine of collateral estoppel did not apply to default judgments, this Court stated:

While the parties agree as to the basic facts, a determination of whether THIRTYACRE's acts were willful and malicious cannot be decided without a hearing. THIRTYACRE, admitting his intoxicated condition, contends that he lacked the requisite intent for his actions to be deemed "willful and malicious" within the meaning of section 523(a)(6). THORP urges this Court to adopt a rule that alcohol or drug use is never a de-

fense to a dischargeability action. On the other hand, THIRTYACRE proposes a standard whereby a drunk or drugged debtor would never be accountable for his actions under Section 523(a)(6). Neither position is acceptable. Rather, before determining whether such a liability is dischargeable, a court must make a fact specific evaluation of the entire circumstances surrounding a debtor's actions. *See In re Haugsrud*, 77 B.R. 340 (Bkrtcy.D.N.H.1987), *citing In re Cloutier*, 33 B.R. 18 (Bankr.D.Me.1983).

The Defendant's first argument is based on some court decisions that under § 523(a)(6) an accident arising out of drunken driving was not a willful and malicious act and Congress' response to those decisions in enacting § 523(a)(9) which makes an injury arising out of the operation of a motor vehicle while intoxicated a nondischargeable debt. Relying on *In re Reeves*, 56 B.R. 472 (N.D.Ala.1985), a case involving a drunken driver where the court held that § 523(a)(9) was inapplicable because the Chapter 7 case was commenced prior to the applicable date of the amendment, the Defendant claims that the enactment of § 523(a)(9), which provides debts arising from drunk driving are nondischargeable, demonstrates that Congress' failure to address other intoxicated situations "shows that 'willful and malicious' cannot now apply to deny the remedial discharge for incapacitation in non-driving situations." The obvious fallacy with the Defendant's argument is that there is nothing in the legislation or legislative history to indicate that Congress considered other injuries arising out of other forms of intoxication in non driving situations much less that it intended that such injuries should be excluded under § 523(a)(6). The obvious is that Congress singled out injuries arising out of drunken driving for special treatment and left other injuries from other forms of intoxication to be decided under § 523(a)(6).

The Defendant also relies on the court's statement in *Reeves* that "§ 523(a)(6) does not adequately fit the ordinary drunken-driver motor vehicle wreck" and argues

that § 523(a)(6) does not fit the analogous ordinary drunken assault and battery. While that may be a fair statement of the majority position of the courts, contrary to the Defendant's arguments, it has little to do with the facts and issue in this case.

*In re Cooney*, 18 B.R. 1011 (Bkrtcy. W.D.Ky.1982), is a factually similar case. There, the debtor, having been drinking since early in the afternoon, became involved in a fracas in a tavern with another patron, unknown previously to the debtor. The debtor claimed that he was absolutely without memory of the assault. The court ruled:

> Liabilities resulting from assault and battery are generally considered to derive from willful and malicious conduct and are therefore nondischargeable in bankruptcy. We have had unfortunate occasion to decide claims based on injuries inflicted by a defendant while in an intoxicated state, and found them to be willful, malicious, and nondischargeable. Our view corresponds with that of the majority of courts considering the question: What was described in 1977 as "the gathering weight of authority" has become more impressive with the passage of time. It may now be considered as settled law that the wantonness of drunken assault is the legal equivalent of malice. State law agrees.

> Here, for the first time before this court, the defense is raised that an alcohol-induced "blackout" prevented formulation of the requisite intent. That temporarily incapacitated state, so goes the theory of the defense, makes impossible any finding of actual malice in the mind of the defendant.

> This is the paradigm case for application of the doctrine of implied intent; even if legal reasoning by implication were not known, this would be the case to warrant its invention.

> The search for malice is always a perplexing exercise, dealing as it does with a brooding malevolence, a private design for harm, from which society seeks protection in the law. Easy to deny and hard to prove, the secret state of mind may be laid bare, if at all, by reference to the acts of its creator. When the actor has no memory at all, the revelation of intent becomes, even to him, an empirical impossibility. Fortunately the law supplies by implication that which cannot be directly proven.

> "You can always imply a condition," said Mr. Justice Holmes. "But why do you imply it?"

> The answer is, of course, that legal implications are tools of conclusory logic, designed to justify an appropriate legal resolution of an otherwise insoluble dilemma.

> Consider, in the case at hand, the result without the legal implication of malice. Liability could be avoided by the simple defense that the actor had no recollection of his harmful acts. The precedent would invite wholesale mayhem without recourse to the injured. Respect for the law as an organ of social justice would diminish.

> In this case there is no proof of medical or psychological nature, other than the defendant's statement that he had never been hospitalized or treated for lapses of memory. Such proof may or may not have facilitated the conclusion reached in this opinion, but regardless, one truth would stand unaltered: The defendant has *not* testified that he had no malicious intent at the time of the assault; he testified only that he *did not remember anything*. The difference is profound. Precise analogy may be made to the computer with a working capacity for data storage but a faulty retrieval system. The errant function does not prove that the information is not there.

*Cooney* was followed in *In re Nunez*, 95 B.R. 566 (Bkrtcy.N.D.Ill.1988), another assault and battery case, where the Bankruptcy Judge stated:

> [The debtor], however, now contends that he was highly intoxicated at the time of the incident and was therefore unable to form any specific intent nor able to have malice imputed to his actions. Intoxication is no excuse where the act of the debtor is clearly intentional. *Cooney*, 18 B.R. at 1014. Upon care-

ful review of the state court record presented, the Court finds no evidence to make a finding that [the debtor] was so highly intoxicated so as to vitiate intent or malice on his part.

*In re Cheripka*, 122 B.R. 33 (Bkrtcy. W.D.Pa.1990), involved a debtor who burned down his house while intoxicated. Drawing a distinction between drunk driving cases, the court stated:

> [The debtors] argue that [the husband's] intoxication vitiated the intent component of § 523(a)(6), citing as authority *Cassidy v. Minihan*, 794 F.2d 340 (8th Cir.1986), and *In re Compos*, 768 F.2d 1155 (10th Cir.1985). Both of these cases involved injuries arising out of drunk driving accidents and in both instances the court ruled that the burden of establishing nondischargeability under § 523(a)(6) was not met because intent to injure was not shown, but merely reckless disregard. These cases are distinguishable from the instant case because the intent of the individuals involved in the drunk driving cases was the intent to operate a vehicle, not the intent to injure. Here, the specific expressed intent of [the debtor husband] was to commit arson. The situation might be analogous to the drunk driving cases if, for example, [the debtor husband] attempted to light a charcoal grill while drunk and then accidentally burned down the house. There the intent would have been to cook food and the unfortunate result merely the happenstance of reckless disregard. On the facts of this case, however, the analogy to the drunk driving cases is misapplied.

*In re Siefke*, 61 B.R. 220 (Bkrtcy.D.Mont. 1986), a case involving an unprovoked assault against a police officer by a chronic alcoholic who claimed to have no recall of the altercation, where the officer suffered a broken jaw and cerebral concussion, from which he has permanent damage, in finding the debt nondischargeable under § 523(a)(6), the court stated:

I find malice in this case from the extent of the beating administered by the Debtor. No one, without utter disregard for human well being, would strike a person with such vicious consequences without meaning to intentionally hurt that individual. Nor is the fact that Debtor was an alcoholic, and intoxicated at the time, sufficient to relieve him of his violent act. *See In re Adams*, 761 F.2d 1422 (9th Cir.1985), where in a drunken driving case the circuit court held such action constitutes sufficiently intentional conduct to support a finding of wilfulness and malice. Accord: *In re Ray*, 51 B.R. 236 (9th Cir.BAP 1985).

While these cases may be factually distinguished or the reasoning might be inapplicable to the facts of this case, several conclusions may be drawn from them.[2] First, the courts do distinguish between the "ordinary drunk driving" case and an assault and battery case. Second, the courts in the assault and battery cases reject the defense raised by the Defendant in this case.

Some courts reject the defense as a matter of law. This Court rejected such an approach by denying the Plaintiff's motion for summary judgment. The reasons for denying it were twofold. First, Defendant's response to the motion for summary judgment provided:

> The parties disagree as to the facts surrounding the underlying cause of action which gave rise to such default judgment....

Second, questions involving intent are factual issues which cannot be decided on summary judgment. It was best to have a hearing to find out what happened. Now, after trial, it seems clear that the Defendant knew what he was doing and that he intentionally went after Brokaw and assaulted the Plaintiff when she got in his way.

The Defendant admits he had been cautioned about drinking while taking Pame-

---

**2.** For example, total reliance on *Siefke* would be inappropriate because in the present case, not much emphasis was put on the Plaintiff's injuries. According to the testimony the Defendant shoved her up against the van. She saw a physician and suffered "inner muscular injury." There is, however, the fact that the Defendant then had to be subdued by police officers.

lor, yet he drank that day anyway. There is no question that at the specific time in question the Defendant was under the influence of Pamelor and alcohol. There is no question that he was a man who had lost his temper and resorted to force. But he was a man with a temper who would resort to force when not under the influence. There is no question that he was distraught over his wife's alleged affair. But he was distraught when not under the influence as well. The difference between his personality and attitude towards his domestic situation when not under the influence or under the influence was not significant.

His actions on that day showed a pattern associated with a person who knew what he was doing. He began drinking at the VFW Club and subsequently had a fight with his wife at their residence. He then had the presence of mind to find the Plaintiff's house, break down the door, go to the local police station, engage in a telephone call with Brokaw, and return for the confrontation with Brokaw. He had made his way from the tavern, to his home, to the Plaintiff's home, to the police station, and then back to Plaintiff's home. It is difficult to accept that he was not in control. When he returned to the Plaintiff's home, he had the presence of mind to try to justify his action by remembering that he was the sheriff. He knew his position in life. He knew enough to tell the Plaintiff to ask about the tape of the telephone call between his wife and Brokaw. He knew enough to tell the Plaintiff that "he had lost it." He knew enough to distinguish the difference between physical damage— i.e. the breaking down of the door—and an immoral act, his wife's alleged affair with Brokaw. He knew where he was, what he was doing, and why he was doing it.

The events that occurred after the assault likewise do not support his position as he engages in selective memory. He remembered the previous day's event of seeing Brokaw and his wife driving in the same direction, but in separate cars, which made him mad. He remembered that he acted because of the alleged affair. Yet he asks this Court to believe that he did not remember his other actions that day.

Nor is this Court persuaded by Dr. Ritterhoff's testimony. The first thing that should be noted is that Dr. Ritterhoff was not the treating physician but testified based upon a review of the Defendant's VA Hospital's records and the Illinois State police report. The second thing that is important to note is that Dr. Ritterhoff's testimony stops short of saying that the Defendant's use of Pamelor while drinking alcoholic beverages prevented his having the ability to form an intent to assault the Plaintiff. The following are some of the questions directed to Dr. Ritterhoff and his answers, which bring out this point.

Question: You were aware of Mr. Thirtyacre's symptoms and you have gone over some of the adverse effects of this drug, with his symptoms and the make-up that you know from the medical records, would there be any adverse effects in his situation?

Answer: To know necessarily ahead of time that the person is going to have an adverse reaction to a medication is difficult to predict. However, there are characteristics that people will evidence in their history which will increase the probability that there could be a problem. And one of the typical ones is that if they have had problems being easily agitated or hyper, that this class of drugs will aggravate that. And that has been pretty well proven. That is called rapid cycling. The literature is pretty clear that people who have presented with depression frequently will sometime later go on to demonstrate what we will call hypomanic episodes after they have been originally treated for depression. In cases of people who have bipolar depression in which they clearly have manic episodes the literature is very clear that those individuals are at a significantly increased risk for the induction of manic symptoms. That doesn't necessarily mean that its automatic or that the degree or severity of the adverse effect is known and usually the common sense rule is that if the person has had very marked symptoms before then they will

probably have a very marked reaction. These drugs are used for individuals when they are depressed and the prescribing physician should be taking these kinds of issues into consideration in deciding the dose, frequency and the frequency with which they evaluate the patient and educate the patient about those kind of complications.

Question: From your review of these [police] records and your knowledge of the drug, if he was on pamelor, how would that affect his ability to control his actions.

Answer: Based on the reports I reviewed, everyone there was describing in my opinion that he was out of control. And, the quality of his being out of control was a generalized kind of thing—inanimate objects, people, all kinds of people were catching his wrath. I am highly suspicious based on everything I have seen and heard about him that his actions were to some degree precipitated by the continued use of that drug. It is difficult for me to say with reasonable certainty that all of his behavior was entirely based on that drug. I would not go that far.

Question: Can you say with a reasonable degree of medical certainty that this drug pamalor with this particular set of medical records of Mr. Thirtyacre and what you know about the drug and Mr. Thirtyacre, would that not decrease his ability to control his actions?

Answer: Yes.

Question: And what about his ability to abstain from drinking, from what you know would the drug have any effect there?

Answer: If the person had the habit of using alcohol as a tranquilizer prior to taking the drug and the drug caused them to become more agitated, it is very easy for that to be seen, and it is seen that they will use more and more alcohol to try to calm themselves down. But to say that the drug itself caused them to develop the habit of using alcohol as a tranquilizer, I cannot go that far. But in general you see people medicating themselves when they have insomnia or rac-

ing thoughts and they don't feel in control, they use alcohol as a poor man's tranquilizer.

Question: [Dr. was asked what was his opinion, within a reasonable degree of medical certainty, whether THIRTY-ACRE had the ability to control himself on the night in question.]

Answer: The night covers many stages of the story. And I know of a period between the time that he arrived at police station and was brought back. That information clearly describes someone who is out of control. And that medication, the pamalor, did contribute to him being out of control. But for me to generalize about the entire time frame, I am not prepared to do that.

\*     \*     \*     \*     \*     \*

Question: And in descending order, what do you believe are the factors that made him out of control?

Answer: The personal, psychological issues that he was coping with, primarily, and secondarily the drug and then last the alcohol.

Question: And that is your opinion to a reasonable degree of medical certainty?

Answer: Absolutely.

The last issue raised by the Defendant, post trial, is that the Plaintiff failed to prove that her damages were in the amount of $25,000.00. At the pretrial conference the parties agreed that the only issue for trial was whether the Defendant had the capacity to form an intent to act willfully and maliciously. That was the issue which was tried. It is now too late to raise an issue of damages.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in the Opinion entered this day; IT IS HEREBY ORDERED:

The Debtor's debt to the Plaintiff, JODY THORP, is found to be nondischargeable under 11 U.S.C. Section 523(a)(6) in the amount of $25,000.00, together with costs and interest at the statutory rate from the date of entry in Mercer County, Case No. 89 L 35, less any amounts previously credited toward the judgment.